**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

SERGEI VASENIN, KEMOYE MUSLAR, and CYNTHIA ACEVEDO, and a class of similarly situated people,

Plaintiffs,

v.

MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, in his official capacity; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; MARCOS CHARLES, Acting Executive Associate Director for Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, in his official capacity; FRANK PADULA, Director, Chicago Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT OF HOMELAND SECURITY; CHRISTOPHER LEE DIXSON, Interim Warden of Miami Correctional Facility, in his official capacity; LLOYD ARNOLD, Commissioner, Indiana Department of Correction, in his official capacity; DR. ADRIENNE BEDFORD, Chief Medical Officer, Indiana Department of Correction, in her official capacity,

Defendants.

Case No.

Class Action

**CLASS ACTION COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This class action lawsuit challenges the inhumane and unconstitutionally punitive conditions inflicted on immigrants held in civil detention inside Indiana's largest and most dangerous high security prison: Miami Correctional Facility ("Miami Correctional"). This highly restrictive state prison is now one of the largest and deadliest U.S. Immigration and Customs Enforcement ("ICE") detention centers in the Midwest. Every day, detained immigrants fear for their lives because of the cruel and degrading conditions to which they are subjected by the State of Indiana defendants (the "State Defendants") and the federal government defendants ("Federal Defendants") (together, "Defendants"). These conditions include dangerously inadequate medical and mental health care and extreme and abusive forms of punishment—such as unfettered use of solitary confinement, excessive lockdowns, and rampant use of excessive force bordering on torture. The Defendants also confine detained immigrants in filthy, run-down buildings and deny them basic necessities.

2. Miami Correctional is an Indiana state penitentiary for men. For most of its history, it has housed people convicted of criminal offenses, often serving long sentences. Over the years, Miami Correctional has gained notoriety for exposing prisoners to deadly and abusive conditions. The facility has faced persistent scrutiny for chronic understaffing and its inability to keep prisoners safe, leading Miami Correctional to record the highest death toll of any prison in the state. Miami Correctional has long been the target of lawsuits that exposed its unconstitutional conditions and confinement practices. These mounting problems forced State Defendants to shutter half the prison in 2022.

3. In 2025, the Trump administration, as part of its mass deportation campaign, substantially increased immigration enforcement arrests and the number of immigrants being held

in detention around the country. This created an immediate need for space to hold tens of thousands of immigrants in civil detention. ICE scrambled to increase its detention spaces across the country, including on military bases and in county jails, office buildings, and other private facilities.

4. In August 2025, ICE announced the opening of what it glibly dubbed the "Speedway Slammer," an immigration detention facility built within the abandoned cells of Miami Correctional. But a civil detention facility is not supposed to be a prison, and civil detention cannot be punitive. The immigrants locked inside Miami Correctional are held in civil detention by the government while they wait for civil immigration courts to decide their cases. They include asylum seekers, permanent residents, and people who have lived and worked in the United States for decades, many with children who are United States citizens. As the Supreme Court has established, people in civil detention are entitled to non-punitive and "more considerate treatment and conditions of confinement" than convicted prisoners. *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Yet Defendants subject the civil detainees at Miami Correctional to the same or even worse punitive and abusive conditions as the prisoners serving criminal sentences there.

5. Day-to-day life at Miami Correctional amounts to punishment. Defendants regularly subject immigration detainees to solitary confinement—a torturous practice unfit for anyone, including those in civil detention—and do so carelessly, often for arbitrary and trivial reasons. Defendants also subject detained immigrants to solitary confinement *en masse* through frequent, extended "lockdowns." State staff at the facility regularly use racial and xenophobic slurs when interacting with detained immigrants, including telling them to "go back to [their] country" and referring to them as "a plague."

6. Defendants have compounded the punishing conditions at Miami Correctional by creating a dangerous medical crisis at the facility. Defendants fail to provide adequate medical care at every level. Defendants refuse to increase professional medical staffing despite widespread failures in healthcare. Defendants also deny detained immigrants proper health screenings, timely and consistent access to medications, necessary interpreters, or even responses to their repeated and urgent requests for medical attention. Severe understaffing makes it impossible for detained immigrants to receive appropriate urgent medical care for emergencies in the facility. The failure of medical care has created crisis conditions at the facility that put all detained immigrants at serious risk of harm and has already resulted in **two** deaths in Miami's short history as a civil immigration detention center.

7. Defendants likewise deprive detained immigrants of minimally adequate mental health care, resulting in extreme suffering, deterioration of psychiatric conditions, and lasting psychological and physical harm. Defendants fail to adequately screen and identify individuals upon arrival for mental illness or risk of suicide, fail to timely connect them to mental health treatment, and fail to timely respond when detained immigrants experience new or worsening mental health symptoms. These failures recently culminated in a detained immigrant attempting suicide in his cell. For days, other detained immigrants alerted Defendants' staff of the man's deteriorating mental condition and begged officers to get him help. Defendants' staff responded by locking the man alone in his cell with dangerous implements he could use for self-harm, including the cable he used to hang himself. On information and belief, this man was hospitalized in critical condition, and it is currently unknown to Plaintiffs whether he is still alive.

8. Defendants further degrade detained immigrants by depriving them of basic necessities. Detainees receive meager portions of meals described by many as worse than dog

food. Defendants hold detained immigrants in squalid and filthy conditions and consistently deny them sufficient hygiene items like soap or toothpaste. Cells holding detained immigrants routinely flood with sewage. Defendants provide detained immigrants with ripped and dirty prison uniforms and rubber shoes unfit for winter.

9. Defendants' unlawful treatment of detained immigrants at Miami Correctional is part of an emerging pattern of unconstitutional abuses across the country in the detention facilities the Trump administration has hastily constructed and repurposed to hold the immigrants it seeks to expel. In the past year, at least eight ICE detention facilities have already been subject to court orders to change the dangerously unconstitutional conditions found to proliferate there. The so-called "Speedway Slammer" has brought the epidemic of unconstitutional immigrant detention to America's heartland, and court intervention is yet again needed to ensure that people locked inside receive the treatment our Constitution guarantees. The "Speedway Slammer" also represents one example of a new and particularly cruel detention arrangement: civil immigration detention inside a state prison that is actively used for punitive confinement.

10. Plaintiffs Sergei Vasenin, Kemoye Muslar, and Cynthia Acevedo are some of the many members of the proposed class of "All civil immigration detainees who are currently detained, or who will be detained, at Miami Correctional Facility" (the "Class"). Plaintiffs have suffered and continue to suffer the rights violations at issue in this case every day they are detained at Miami Correctional.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction as to the Federal Defendants under 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Constitution and laws of the United States, including the Fifth Amendment to the United States Constitution. Federal Defendants have waived sovereign immunity for purposes of this action. *See* 5 U.S.C. § 702.

12. The Court also has jurisdiction over this case as to the State Defendants pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiffs bring suit for injunctive and declaratory relief under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983 for violations of their civil rights.

13. This Court has authority to grant injunctive relief in this action pursuant to its inherent equitable authority, Rule 65 of the Federal Rules of Civil Procedure, and the All Writs Act, 28 U.S.C. § 1651. This Court has the authority to issue a declaratory judgment under the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201, 2202.

14. Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(e) because at the time of the filing of this action, Plaintiffs are detained in both the Federal and State Defendants' custody within this District; a substantial part of the events and omissions giving rise to these claims occurred, and continue to occur, in this District; and Federal Defendants are officers or employees of the United States acting in their official capacities, while State Defendants are officers or employees of the State of Indiana, acting in their official capacities.

15. Assignment to the South Bend Division is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendants' actions and/or omissions that resulted in the violation of Plaintiffs' constitutional rights occurred in this division.

## PARTIES

### Plaintiffs

16. Plaintiff Sergei Vasenin is a Ukrainian-born immigrant from the Russian Federation. He is currently detained under the authority of Federal Defendants at Miami Correctional, which is operated by State and Federal Defendants. Mr. Vasenin entered the United States in October of 2022, requested asylum, and was granted humanitarian parole. Mr. Vasenin

has no criminal convictions, yet agents of Defendant ICE surrounded him with guns at his home in October 2025, arrested him, then brought him to Miami Correctional. He has spent close to one year detained at Miami Correctional, during which time he has experienced punitive and abusive conditions, including denials of health care, threats and misconduct by staff, insufficient food, and placement in solitary confinement for approximately nine weeks for arbitrary reasons. In solitary confinement, Mr. Vasenin spent up to 23 to 24 hours per day in a tiny, frigid cell where he was repeatedly denied timely and consistent mental health care and medication, despite a severe decline in his mental health that led him to repeatedly contemplate suicide.

17. Plaintiff Kemoye Muslar is an immigrant from Jamaica. He is currently detained under the authority of Federal Defendants at Miami Correctional, which is operated by State and Federal Defendants. Mr. Muslar was admitted to the United States in September 2024 and, before his detention, lived in upstate New York with his wife. Mr. Muslar has no criminal convictions or pending criminal charges, yet Defendant ICE arrested him in November 2025 when he attended a scheduled biometrics appointment for his legal permanent residency application, which he submitted based on his wife's status as a U.S. citizen. In his 10 months at Miami Correctional, he has personally experienced and observed degrading and punitive conditions, including dangerous delays and deficiencies in medical and mental health care, excessive and punitive lockdowns lasting up to 10 days, disgusting and insufficient food, and lack of appropriate hygiene and clothing items.

18. Plaintiff Cynthia Acevedo is an immigrant from Guatemala. She is currently detained under the authority of Federal Defendants at Miami Correctional, which is operated by State and Federal Defendants. Ms. Acevedo is a transgender woman who has lived in the United States for 26 years. Before her detention, Ms. Acevedo lived in Miami, Florida with family, where

she operated a house-cleaning business. She has no criminal convictions or pending criminal charges but was arrested by Defendant ICE while working in July 2026 and brought to Miami Correctional. Ms. Acevedo was diagnosed with epilepsy more than 30 years ago and has only been able to control her seizures with medication. Since she arrived at Miami Correctional, Defendants switched her to a different medication which is not as effective at controlling her seizures, and Defendants fail to provide her with even this medication on a regular basis. As a result, Ms. Acevedo now suffers multiple seizures per week. Ms. Acevedo is a native Spanish speaker with limited English proficiency, but Defendants often fail to provide Ms. Acevedo with an interpreter at medical visits. Moreover, Ms. Acevedo was the victim of a sexual assault by another detainee at Miami Correctional after her arrival. Defendants failed to take her report on the assault for multiple days (despite her immediate attempts to report it), failed to examine her and conduct a rape kit, failed to provide her medication to prevent transmission of HIV, and failed to provide her requested HIV testing and any test results. Ms. Acevedo has been harmed by her experience at Miami Correctional and the damage to her physical and mental health worsens every day she remains detained there.

## Federal Defendants

19. Defendant Markwayne Mullin is sued in his official capacity as the Secretary of the U.S. Department of Homeland Security ("DHS"). In this capacity, he directs each of the component agencies within DHS, including ICE. Secretary Mullin is therefore responsible for the administration and enforcement of immigration laws under 8 U.S.C. § 1103, including ICE's administration of detention facilities, such as Miami Correctional, and ensuring ICE's compliance with the Constitution and other applicable laws and policies. He is a legal custodian of Plaintiffs and the members of the putative Class. Any private contractors or sub-contractors used by DHS

to care for immigrants detained in their custody at Miami Correctional—including State Defendants, Centurion Health of Indiana, LLC ("Centurion"), and their personnel—are agents of Defendant DHS, and Defendant DHS remains constitutionally responsible for their operations at Miami Correctional.

20. Defendant David Venturella is sued in his official capacity as the Acting Director of ICE, an agency within DHS. Acting Director Venturella is responsible for ICE's policies, practices and procedures, including relating to the detention of immigrants, and for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies at ICE facilities. He is a legal custodian of Plaintiffs and the members of the putative Class.

21. Defendant Marcos Charles is sued in his official capacity as the Acting Executive Associate Director for ICE Enforcement and Removal Operations ("ERO"). Acting Executive Associate Director Charles is responsible for ICE's enforcement and removal operations, including ICE's administration of holding and detention facilities, such as Miami Correctional, and is responsible for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies at ICE facilities. He is a legal custodian of Plaintiffs and the members of the putative Class.

22. Defendant Frank Padula is sued in his official capacity as the Director of the Chicago Field Office of ICE ERO. Director Padula oversees the Chicago Field Office and is responsible for enforcement and removal operations in the geographic area covered by the Chicago Field Office, including Miami Correctional and the Indianapolis Sub-Field Office. He is responsible for ensuring ICE agents in this district follow ICE's policies, practices, and procedures, including those relating to the detention and detention conditions of immigrants, and for ensuring

their compliance with the Constitution and other applicable laws and policies. He is a legal custodian of Plaintiffs and the members of the putative Class.

23. Defendant DHS is an executive department of the United States, headquartered in Washington, D.C., and is responsible for enforcing federal immigration laws. DHS is a legal custodian of Plaintiffs and the members of the putative Class.

24. Defendant ICE is a component of DHS, headquartered in Washington, D.C., and is responsible for enforcing federal immigration law, including the arrest, detention, and removal of immigrants. ICE is responsible for ensuring immigrants in civil immigration detention are kept in conditions that comply with the Constitution and other applicable laws and policies. ICE has contracted with the Indiana Department of Corrections ("IDOC") to run and manage Miami Correctional. ICE is a legal custodian of Plaintiffs and the members of the putative Class.

**State Defendants**

25. Defendant Lloyd Arnold is sued in his official capacity as the IDOC Commissioner. The IDOC commissioner oversees the statewide correctional system, which includes Miami Correctional, and has management and administrative responsibilities at Miami Correctional. Arnold is a custodian of Plaintiffs and the members of the putative Class and is responsible for the correctional policies and practices outlined in this Complaint, as well as for ensuring that correctional officers at Miami Correctional comply with correctional standards and Federal Defendants' policies and procedures regarding immigration detention.

26. Defendant Christopher Lee Dixson is sued in his official capacity as the Interim Warden of Miami Correctional. The warden is the highest-ranking official at Miami Correctional and has management and administrative responsibilities at Miami Correctional, including overseeing its day-to-day operations. He is a custodian of Plaintiffs and the members of the

putative Class and is responsible for the correctional policies and practices outlined in this Complaint as well as for ensuring that correctional officers at Miami Correctional comply with correctional standards and Federal Defendants' policies regarding immigration detention.

27. Defendant Adrienne Bedford is sued in her official capacity as the Chief Medical Officer of IDOC. Dr. Bedford serves as the highest clinical authority within IDOC and oversees all physical and mental health care in its facilities, including the medical and mental health care of Plaintiffs and the members of the putative Class. She is responsible for overseeing IDOC's medical services contract with private medical provider Centurion Health of Indiana, LLC, and for the policies and practices of IDOC in their medical treatment of immigrants detained at Miami.

## FACTUAL BACKGROUND

### A. State Defendants Have a Long History of Subjecting People at Miami Correctional to Unsafe Conditions and Chronic Understaffing

28. Miami Correctional is the largest state prison in Indiana, with a total capacity of 3,188 beds for housing adult males.[1] Miami Correctional was built on the site of a former U.S. Air Force base in Bunker Hill, Indiana. It opened in 2001.[2]



Photograph of building behind barbed wire within Miami Correctional Facility, taken on June 22, 2026

[1] *See* Ind. Dep't of Corrs., *Fact Sheet: Miami Correctional Facility*, https://www.in.gov/idoc/files/Miami_Fact_Sheet.pdf (last visited Oct. 26, 2026).

[2] *Id.*



[3]

29. Miami Correctional is the deadliest prison in Indiana. From 2019 to August 2025, 133 prisoners died while in State Defendants' custody at Miami Correctional.[4] Of the deaths, 93 were attributed to illness and more than 30 were from homicides, suicides, accidents, or overdoses.

30. For years, IDOC has faced scrutiny for its inability to keep prisoners safe at Miami Correctional. Defendant Lloyd Arnold recently admitted to state lawmakers that, "since about 2017, we've really struggled with . . . the ability to keep those incarcerated [at Miami Correctional] safe."[5] As death tolls rose at Miami Correctional, State Defendants continued to permit the facility to operate under dangerous conditions, including by allowing severe understaffing and the absence of basic safeguards to protect prisoners, such as alarm buttons that allow prisoners to alert officers

[3] Source image from Nikki Kelly, *Behind the walls of Indiana's ICE detention facility*, Indiana Capital Chronicle, (Dec. 22, 2025, at 7:00 ET), https://indianacapitalchronicle.com/2025/12/22/behind-the-walls-of-indianas-ice-detention-facility/.
[4] Kristine Phillips, *Deaths, drugs and discord: Inside Speedway Slammer, Indiana's latest ICE detention center*, Indianapolis Star (Dec. 1, 2025, at 10:38 ET), https://www.indystar.com/story/news/investigations/2025/11/04/ice-detention-speedway-slammer-indiana-plagued-with-violence-miami-correctional-facility-immigration/86116762007/.
[5] Ind. State Budget Agency, *Indiana State Budget Committee September 17, 2025*, at 16:29 (YouTube, Sep. 17, 2025), https://youtu.be/P0WALDXm7WI?si=sZqXiwBpAczDUxv6&t=989.

in an emergency.[6] State Defendants have also permitted widespread abuse by correctional officers, reporting more incidents of officer use of force than any other prison in the state between 2015 and August 2025.[7]

31. State Defendants have long allowed chronic staffing shortages to persist—on both the medical and custody sides—at Miami Correctional, knowingly incarcerating more people than they can protect. State Defendants let staffing levels steadily decline for years, leading to frequent lockdowns and ultimately forcing the closure of half of the prison's buildings. In late 2020, for example, one-third of State Defendants' Miami Correctional staff positions were vacant, and the prison lost more than 30 employees every month.[8] By July 2021, IDOC reported that Miami Correctional was operating with 200 staff vacancies.[9] At times, staffing levels fell so low that a single officer would sometimes be in charge of a dorm holding up to 200 prisoners, resulting in entire housing units being placed on lockdown.[10]

32. By 2022, Miami Correctional became so understaffed that IDOC shut down half of the prison and transferred hundreds of prisoners elsewhere.[11]

---

[6] Phillips, *supra* note 4.

[7] *Id.*

[8] Jake Harper, *Chaos At Indiana's Miami Prison Takes A Toll On Staff*, WYFI Indianapolis (Oct. 30, 2020, at 12:00 ET), https://www.wfyi.org/public-affairs/2020-10-30/chaos-at-indianas-miami-prison-takes-a-toll-on-staff ("Indiana's state prisons have been plagued by staffing issues for years, but the Miami Correctional Facility suffers the most. Five years ago, the prison had nearly 400 custody staff — correctional officers, sergeants and others responsible for security and inmate movement. It now operates with 266, according to the latest monthly report from the Indiana Department of Correction. One third of the Miami prison's staff positions are vacant, and since May, it has lost more than 30 employees every month.").

[9] Christopher Yirenkyi, *Offender Population Statistical Report*, Ind. Dep't of Corrs., 6 (2021), https://www.in.gov/idoc/files/0721-OffenderPopulation.pdf; *see also* Jon Webb, *Death of former Evansville man is just the latest problem at Miami Correctional Facility*, Courier & Press, (Sept. 9, 2021, at 5:33 CT), https://www.courierpress.com/story/news/2021/09/09/indiana-prisons-problems-extend-beyond-death-ex-evansville-man/5768314001/.

[10] Phillips, *supra* note 4.

[11] Phillips, *supra* note 4; *see also* Kelly, *supra* note 3.

33. Miami Correctional is also notorious for its abusive solitary confinement practices and has been the subject of repeated federal litigation. In recent years, IDOC paid more than $1.2 million to settle 31 lawsuits filed by people held in total or near-total darkness for days or months on end at Miami Correctional. The lawsuits alleged that State Defendants' correctional staff confined individuals in cells with no working lights and live wires hanging from the ceilings. A corrections expert in those cases said he had never seen "such a blatant and systematic application of isolation and sensory deprivation, deviating from correctional standards and common sense."[12]

**B. State Defendants Contract with Federal Defendants to Use Miami Correctional as the So-Called "Speedway Slammer" for Civil Immigration Detention at a Substantial Profit to the State**

34. On August 1, 2025, Indiana Governor Mike Braun's office affirmed its commitment to "deploy any and all resources to assist President Trump and ICE" in their mass deportation efforts.[13] In keeping with that promise, Governor Braun announced the same day that IDOC was "working with ICE to make available up to 1,000 beds at Miami Correctional Facility."[14]

35. Days later, on August 5, 2025, Kristi Noem, then-secretary of Defendant DHS, announced this partnership on X: "COMING SOON to Indiana: The Speedway Slammer,"[15] a reference to the Indianapolis Motor Speedway. On August 8, 2025, the official DHS page on X

---

[12] Press Release, ACLU of Indiana, *ACLU of Indiana Finalizes $1.2 Million in Settlements Over Abuse at Miami Correctional Facility* (Apr. 27, 2026, at 9:00 ET), https://www.aclu-in.org/press-releases/aclu-of-indiana-finalizes-1-2-million-in-settlements-over-abuse-at-miami-correctional-facility/.

[13] Kristine Phillips & Alexandria Burris, *IDOC prison to house up to 1,000 immigrant detainees as part of effort to ramp up arrests*, Indianapolis Star (updated Aug. 1, 2025, at 16:27 ET), https://www.indystar.com/story/news/politics/2025/08/01/gov-mike-braun-deportation-undocumented-immigrants-trump-ice-camp-atterbury-prison-jails-detention/85430333007/.

[14] Press Release, Indiana State Government, *Governor Braun Announces Cooperation Agreements with Federal Immigration Enforcement* (Aug. 1, 2025), https://events.in.gov/event/Governor-Braun-Announces-Cooperation-Agreements-with-Federal-Immigration-Enforcement.

[15] Special Envoy Kristi Noem (@EnvoyNoem), X (Aug. 5, 2025, at 16:45 ET), https://x.com/EnvoyNoem/status/1952848368054730963.

made a similar post, including an AI-generated image of white race cars, emblazoned with the word "ICE," speeding on a racetrack in front of a prison:[16]




36. At IDOC's request, in September 2025, Indiana legislators approved $15.79 million in state funding to support the "outfitting of Miami Correctional Facility for ICE detainees."[17] This funding was supposed to pay for "a series of infrastructure upgrades and equipment purchases," such as body scanners, fencing, and transport vehicles.[18] But State Defendants did not expend the

[16] Dep't of Homeland Security (@DHSgov), X (Aug. 8, 2025, at 17:19 ET), https://x.com/DHSgov/status/1953944087729447255; *see also* Benjamin S. Weiss, *IndyCar rebukes White House after 'Speedway Slammer' post*, Courthouse News Serv. (Aug. 6, 2025), https://courthousenews.com/indycar-rebukes-white-house-after-speedway-slammer-post/ (in response to IndyCar's complaints about violations of IP rights, a DHS spokesperson says that "an AI generated image of a car with 'ICE' on the side does not violate anyone's intellectual property rights" and "DHS will continue promoting the 'Speedway Slammer' as a comprehensive and collaborative approach to combatting illegal immigration").

[17] Casey Smith, *Budget panel approves $15.79M for immigration detention upgrades at Miami Correctional Facility*, Ind. Cap. Chron. (Sept. 17, 2025, at 12:07 ET), https://indianacapitalchronicle.com/2025/09/17/budget-panel-approves-15-79m-for-immigration-detention-upgrades-at-miami-correctional-facility/.

[18] *Id.*

funds on the upgrades and equipment that were critically needed to support detained immigrants that Miami Correctional was about to receive.[19]

37. State Defendants expected and ultimately received substantial financial gains from their deal with the Trump administration. During a hearing on IDOC's request for this funding, Defendant IDOC Commissioner Lloyd Arnold explained that "[w]e wouldn't be doing it if there was not a built-in profit."[20] Arnold has stated he expects the profits only to increase as the Federal Defendants send more detained immigrants to Miami Correctional in coming months.[21]

38. On September 30, 2025, IDOC began a two-year Intergovernmental Service Agreement (the "Agreement") with Defendants DHS and ICE for Miami Correctional to provide ICE with 1,000 beds for adult males until September 29, 2027, with the possibility of further extension. *See* Ex. 1, Agreement at 1.

39. Under the Agreement, Federal Defendants pay State Defendants a daily rate of $291.24 per detainee. This is almost four times the $75 daily per-person cost for State prisoners serving criminal sentences at Miami Correctional.[22] These payments guaranteed the State Defendants at least $80 million in only two years.

40. Under the Agreement, Defendant ICE had 120 days to "fill 450 beds with detainees or be required to reimburse [Miami Correctional] for 450 beds at a minimum as a guarantee of

---

[19] Indiana State Budget Agency, *SBA – Indiana State Budget Committee June 18, 2026* (YouTube, June 18, 2026), https://www.in.gov/sba/budget-committee/archived-budget-committee-hearings/sba-indiana-state-budget-committee-june-18,-2026/ (Rep. Ed Delaney: "I think the bottom line, Mr. Chairman, is that there really were not a lot of upfront costs. There were ongoing costs that we are now getting covered by a different way. It's not like we put out $15M as we had expected?" Defendant Arnold: "Correct").
[20] Smith, *supra* note 17.
[21] Jack Forrest, *Budget committee hears update on ICE detention cost, electrical grid analysis grant*, Ind. Cap. Chron. (June 19, 2026, at 4:15 ET), https://indianacapitalchronicle.com/2026/06/19/budget-committee-hears-update-on-ice-detention-cost-electrical-grid-analysis-grant/. This is despite the fact that federal law prohibits the federal government from contracting with state entities at a profit. *See* "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards" ("UAR"), 2 C.F.R. Part 200.400(g).
[22] Kelly, *supra* note 3.

security of payment." Federal Defendants rushed to fill Miami Correctional's abandoned spaces with immigrants and met this quota before the end of 2025. They did so without first resolving the widespread and chronic staffing shortages that have plagued Miami Correctional for years.

41. As part of the Agreement, State Defendants were required to ensure "that the safekeeping, housing, subsistence, medical, and other program services" provided to detained immigrants held in the prison are "consistent with ICE's civil detention authority, IGSA requirements, ICE standards incorporated and referenced in this agreement, and all applicable state and local laws."[23]

42. The Agreement mandates that State Defendants "house ICE [detainees] and perform related detention services, at a minimum, in accordance with [ICE's] National Detention Standards 2025 or most current version," which are the 2026 National Detention Standards ("2026 NDS").[24] These standards, which apply to immigration detention facilities across the country, "describe a facility's immigration detention responsibilities, explain what detainee services a facility must provide, and identify what a facility must do to ensure a safe and secure detention environment for staff and aliens in detention."[25]

**C. Defendants Contract Outsourced Medical Care at Miami Correctional to a Notoriously Underperforming For-Profit Vendor**

43. As part of the Agreement, IDOC also contracted with Defendant ICE to provide medical services to detained immigrants. Since 2021, IDOC has contracted with Centurion Health of Indiana, LLC, a for-profit health services company, to serve as the medical provider at its

---

[23] Ex. 1, Agreement, Art. § 1(B).

[24] Ex. 1, Agreement at 1; U.S. Immigr. & Customs Enf't, *National Detention Standards, Revised 2026* (updated June 15, 2026, https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf; *see also* U.S. Immigr. & Customs Enf't, *National Detention Standards, Revised 2025* (updated June 18, 2025), https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf [https://perma.cc/4JRQ-PUZJ] ("2025 NDS").

[25] U.S. Immigr. & Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (last visited Oct. 9, 2026).

facilities, including Miami Correctional. Throughout the term of that $1 billion contract, Centurion has never provided the full complement of medical staff that they were hired to provide.

44. Per the Agreement, State Defendants were required to "obtain [Federal Defendants'] approval before subcontracting [] the care of detainees to" Centurion. Ex. 1, Agreement, Art. § 15(f). On the same day that Defendants ICE and IDOC executed the Agreement, IDOC also amended its contract with Centurion to require that the private contractor fill "separate staffing levels [] to meet the medical, dental and mental health services set forth in the State's contract with" ICE.[26] The amendment provided that Centurion would deliver *fewer* services to immigrants detained by ICE than to prisoners, including in areas like addiction recovery services.

45. Centurion has a documented history of failures at correctional facilities, both in Indiana and across the country, of which both Federal and State Defendants are (or should be) well aware.

46. Centurion has perennially understaffed its facilities. State records show that the number of Centurion full-time equivalent (FTE) staff at Miami Correctional dropped from 67.25 per week in 2021 to 62.25 in 2026. Among the positions that lost working hours were licensed practical nurses and registered nurses. In March 2026, the IndyStar reported that several mental health staff at Indiana State Prison had resigned in frustration after Centurion's chronic understaffing and failure to provide adequate mental health care fueled a years-long suicide crisis at the facility, which has the highest suicide rate per capita in the state's correctional system.[27]

47. Centurion has faced more than 100 lawsuits alleging inadequate medical care, involving prisoners who "are ignored by correctional and medical staff and their condition worsens

[26] Ex. 4, Amendment #5 to Professional Services Contract by and between IDOC and Centurion (Sept. 30, 2025).
[27] Kristine Phillips, *This prison had a suicide crisis. Then it lost its mental health staff.*, Indianapolis Star (updated Mar. 5, 2026), https://www.indystar.com/story/news/investigations/2026/03/03/indiana-state-prison-suicide-crisis-prompts-mental-health-staff-to-leave-centurion-incarceration/88533713007/.

to the point of dangerous complications or death."[28] It is defending 150 lawsuits in the Northern and Southern Districts of Indiana alone concerning prisoners' rights issues. These lawsuits have been brought on behalf of both state prisoners and detained immigrants. One former detained immigrant recently sued Centurion for its failure to provide his necessary seizure medication at Miami Correctional, resulting in his hospitalization after a severe seizure.[29]

48. Centurion has similarly developed a reputation for cover-ups and false reporting of medical failures.[30] Despite Centurion's extensive track record for poor management and patient care, Defendants have entrusted Centurion with the medical and mental health care of immigrants detained at Miami Correctional.

49. In July 2026, IDOC amended its contract with Centurion to require roughly 13 additional medical staff positions for the immigration detention unit at Miami Correctional.[31] However, it is not clear whether any of the new staff positions (or what portion of the previously required staff positions) have been filled. Indeed, as of June 2026, Centurion had filled only 54% of required medical staff positions for immigration detention at Miami Correctional.[32]

---

[28] Kaitlin Washburn, *Ignored, misdiagnosed, left to die – Illinois prisoners' health in hands of new provider with shoddy track record*, Chi. Sun Times (Dec. 10, 2025, at 5:30 CT), https://chicago.suntimes.com/the-watchdogs/2025/12/10/prison-health-care-illinois-centurion.

[29] *See* Complaint, Dkt. 1, Case No. 3:26-cv-01110 (N. D. Ind., filed July 27, 2026).

[30] Xerxes Wilson, *State-backed whistleblower suit claims neglect in Delaware prison care*, Del. News J. (updated June 16, 2026, at 14:11 ET), https://www.indystar.com/story/news/2026/06/16/delaware-sues-prison-healthcare-contractor-over-fraud-allegations/90494603007/.

[31] Kristine Phillips, *Indiana adds $3.5M to boost medical staffing for ICE detainees at Miami prison*, Indianapolis Star (updated Oct. 5, 2026, at 20:19 ET), https://www.indystar.com/story/news/investigations/2026/10/05/indiana-adds-3-5-million-medical-staff-ice-detainees-immigration-mike-braun-miami-correctional/92056459007/.

[32] *Id.*

50. Historically, IDOC imposed financial penalties on Centurion if Centurion failed to fill minimum agreed-upon staffing levels in IDOC facilities.[33] Since 2022, Centurion has already paid IDOC $21 million in penalties for its persistent failure to fill vacant staff positions.[34]

51. But shortly before Federal Defendants began sending detained immigrants to Miami Correctional, IDOC agreed to eliminate Centurion's understaffing penalties "in exchange for Centurion not raising the daily rate it charges the state for each inmate."[35] IDOC agreed not to hold Centurion accountable for its chronic understaffing at prisons like Miami Correctional in order to ensure a higher profit margin for the State.

## IMMIGRANTS DETAINED AT MIAMI CORRECTIONAL ARE SUBJECTED TO UNCONSTITUTIONAL PUNITIVE CONDITIONS

### A. Conditions of Civil Immigration Detention Must Be Non-Punitive and Objectively Reasonable

52. The immigrants detained at Miami Correctional are civilly detained and entitled to treatment as such. The Constitution explicitly distinguishes between the conditions applicable to people who are convicted of a criminal offense and serving a sentence as punishment, on the one hand, and civil detainees like the immigrants ICE warehouses at Miami Correctional on the other. The Supreme Court has made clear that those in civil detention "are entitled to more considerate treatment and conditions of confinement than" convicted prisoners "whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).

53. Unlike criminal detention, civil detention must be "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Courts have long made clear that "the

---

[33] *See* Ex. 3, Professional Services Contract by and between IDOC and Centurion at 1-2, 322 (July 1, 2021).
[34] Kristine Phillips, *Indiana dropped prison staffing penalties before ICE detainee deaths*, Indianapolis Star (Sept. 1, 2026, at 5:02 ET), https://www.indystar.com/story/news/investigations/2026/09/01/indiana-dropped-prison-staffing-penalties-before-ice-detainee-deaths-miami-mike-braun-immigration/91156117007/.
[35] *Id.*

restrictions and conditions of [a civil] detention facility" cannot "amount to punishment" because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979). People in civil detention "(unlike convicted prisoners) cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).

54. The Due Process Clause protects detained immigrants from "abusive conditions" of confinement. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). At a minimum, due process requires the government to provide for a detained individual's "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

55. Conditions of confinement violate the Due Process Clause if they are either (1) objectively unreasonable—that is, "not rationally related to a legitimate non-punitive governmental purpose" or "excessive in relation to that purpose," or (2) imposed "with an expressed intent to punish." *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019) (quoting *Kingsley*, 135 S. Ct. at 2473).

56. As physical and legal custodians of Plaintiffs and the putative Class, Federal and State Defendants have independent constitutional responsibility for the treatment and conditions of confinement for all immigrants civilly detained at Miami Correctional. Contracting out operations at the facility to the State of Indiana or private contractors "does not relieve [Defendants] of [their] constitutional duty," so they remain responsible for its compliance with the law and the humane treatment of those held there. *West v. Atkins*, 487 U.S. 42, 56 (1988). To the extent that Defendants have contracted with other public or private entities to provide care for immigration detainees in their custody, Defendants cannot delegate—and still retain legal responsibility for—the care of individuals in their custody.

## B. Immigrants Civilly Detained at Miami Correctional Experience Punitive Conditions with No Legitimate Justification

### 1. Prison Environment for Immigrants in Civil Detention

57. Civilly detained immigrants are confined at Miami Correctional because they are waiting either for courts to decide their civil immigration cases or for Federal Defendants to make travel arrangements to remove them from the country. None are detained because they are serving a criminal sentence. Despite this, State and Federal Defendants treat detained immigrants in a punitive and abusive manner indistinguishable from the prisoners who live just across the wall.




Photograph of building behind barbed wire within Miami Correctional facility, taken on June 22, 2026



Photograph of barbed metal fence at Miami Correctional, taken on June 22, 2026

58. Miami Correctional was built and operates as a high-security prison for all who are held within its walls. Detained immigrants live in prison cells in locked buildings surrounded by concrete fences and barbed wire. They are primarily held in large housing units—the same housing units previously used to hold prisoners—with a capacity of approximately 200 people. These pods hold approximately 100 two-person cells, divided between two floors with a single shared day room.

59. Immigrants detained at Miami Correctional are held in two-person cells about 5 feet by 11 feet in size—smaller than an average parking space. Each cell has concrete walls, a metal door, metal beds, and exposed metal toilets with attached sinks.



60. The State Defendants and Federal Defendants share joint responsibility for detention conditions at Miami. The State Defendants regularly assign State prison officers from the prison side to help operate the immigration detention side of the facility. Detained immigrants regularly see prison staff working in the immigration units, including the unit used for solitary confinement, and treating detained immigrants in the same way they treat the convicted prisoners at Miami Correctional. These are the same prison staff that engaged in more incidents of officer use of force than any other prison in the state in the last decade.[36]

61. Defendants have imposed a culture of punishment at Miami Correctional. Claustrophobic indoor confinement and lockdown is the baseline reality for the people locked inside.

**2. <u>Harmful Solitary Confinement</u>**

62. By policy and practice, State and Federal Defendants impose extreme and abusive punishment on detained immigrants at Miami Correctional in the form of solitary confinement. Defendants lock detained people in small cells, alone or with another detainee, for 23 to 24 hours per day, with little or no justification. The placement of detained immigrants in solitary confinement cells at Miami Correctional—sometimes referred to as "segregated housing units" (SHU), "segregated management units" (SMU), or more recently, "progressive lockdown" or "progressive units"—is wholly unjustified and objectively unreasonable.

63. State Defendants' staff sometimes send detained immigrants to solitary confinement in the S block or A block, both of which are in the state prison side of the facility. There, detained immigrants are punished in cells alongside convicted state prisoners in a manner indistinguishable from that imposed on state prisoners.

---

[36] *See* Phillips, *supra* note 4.

64. State Defendants' staff also send detained immigrants to a different segregation unit in a sequestered section of B block, a dedicated solitary confinement space on the immigration side of the facility. State Defendants converted this side of B block from general housing to a segregation unit in spring 2026; previously, they sent all detained immigrants placed in solitary confinement to the state prison segregation blocks.

65. Federal and State Defendants fail to maintain clear policies and procedures that limit the use and severity of solitary confinement. State Defendants' policies lack any clear limits on lengths of time a detained person can spend in segregation, *see* Ex. 2, IDOC Miami Correctional Facility Detainee Handbook Rules and Regulations (Oct. 2025) ("DH") at 8-9, and Federal Defendants fail to ensure compliance with even basic detention standards that require a limit of 30 days per incident, *see* 2026 NDS § 2.9, II(B)(1).

66. Without any clear, conduct-based criteria for placement in solitary confinement, State and Federal Defendants regularly place detained immigrants in solitary confinement for arbitrary and minor "infractions" at the unpredictable discretion of the prison guards. State Defendants send detained immigrants to segregation for minor disagreements with guards or other detainees, when they are the victims of abuse, or for no reason at all. For example, State Defendants forced Plaintiff Sergei Vasenin to spend approximately nine weeks in solitary confinement after determining on two separate occasions that he did not engage in any behavior warranting segregation.

67. Defendants subject detained immigrants to this unrestrained solitary confinement for prolonged periods of time. Defendants hold some detained immigrants in solitary confinement for weeks or even months, allowing them to leave only every few days to shower. One detained immigrant spent more than a month in segregation for "refusing orders" after he moved too slowly

to leave the shower and get dressed for lockdown; he later learned that State corrections officers reported different (and false) reasons for his placement. State Defendants sent another detained immigrant to isolation for more than two weeks after corrections staff pepper sprayed him five times and physically assaulted him twice while restrained for declining to attend a medical appointment. Federal Defendants were aware of State Defendants' actions and refused to intervene on his behalf.

68. Defendants force immigrants held in segregation to spend between 23 and 24 hours of every day in their cells. They are forced to eat and sleep in their cells, with limited opportunities to communicate or interact with others and little sensory stimulation. Beyond tablets provided to some (which may or may not work), detained immigrants have almost nothing to do in their cells—they have limited access to reading materials, no access to television, and no access to other forms of recreation. Plaintiff Sergei Vasenin describes staring at the cell walls for hours on end and talking out loud to himself to stay sane.

69. Defendants deprive detained immigrants of an opportunity to hear or contest the reason for their placement in solitary confinement. Most detained immigrants do not participate in disciplinary hearings prior to this placement. Many do not receive paperwork or written notice of any kind identifying the alleged charges or infractions for which they are receiving punishment. Detained immigrants often do not receive any explanation as to why they are in solitary confinement or the length of time they will be held there, let alone an opportunity to contest their punishment. This leads detained immigrants to experience additional fear and anxiety, as they are unable to steel themselves for a defined period of time but rather endure their solitude in endless uncertainty.

70. The conditions in solitary confinement cells in all segregation units are especially horrifying. The cells are kept at such frigid temperatures that some detainees use toilet paper to cover the vents. People endure dangerous and filthy conditions, such as blood and feces on the floors, clogged toilets, and odors so putrid that State Defendants' correctional staff wear masks to block the smell. Defendants routinely fail to provide detained immigrants with meals at normal times or in sufficient amounts. Detained people also have no access to clean water in the SHU; guards tell them to drink from sinks attached to toilets, which makes them sick.

71. Defendants have sent so many detained immigrants to solitary confinement that some detainees in B block are required to double up, sharing a tiny isolation cell with another person. This kind of "double celling" in solitary can be worse than locking a person in confinement by themselves, as it increases the tension and profound stress caused by living in claustrophobic confinement by depriving people of any respite or privacy in such a small space. These tensions can lead to further emotional distress, psychological harm, or even physical violence.[37]

72. Defendants' practices are particularly dangerous for people with mental health conditions. Despite the well-recognized harm of subjecting individuals with mental health conditions to segregation, State Defendants lack any clear policies or practices for assessing whether individuals are being placed in segregation for behaviors that are a manifestation of their mental health conditions and/or whether placement in solitary confinement puts them at increased risk for decompensation, self-harm, and/or suicide. Defendants also fail to ensure that individuals receive the mental health care they need while subjected to solitary confinement to prevent further harm.

---

[37] Christie Thompson and Joe Shapiro, *The Deadly Consequences of Solitary With a Cellmate*, The Marshall Project (Mar. 24, 2016, at 7:00 ET), https://www.themarshallproject.org/2016/03/24/the-deadly-consequences-of-solitary-with-a-cellmate.

73. State and Federal Defendants work together to impose the abusive solitary confinement practices at Miami Correctional. *See, e.g.*, 2026 NDS § 2.9, II(C)(3) (requiring State Defendants "to coordinate with ICE" in reviewing all segregation placements and "[e]valuating whether less restrictive housing or custodial options are appropriate and available"); § 2.9, II(M)(1) (requiring State Defendants "to coordinate with ICE/ERO to explore alternatives to [segregation] housing for detainees with a" serious mental illness and to "immediately notif[y ICE/ERO] if a detainee with [a serious mental illness] is placed in" solitary confinement).

74. State Defendants' indiscriminate and indefinite use of solitary confinement at Miami Correctional violates even Federal Defendants' low standard governing segregation in immigration detention facilities, which requires that administrative or disciplinary segregation be used for limited, documented purposes and require medical and mental health involvement, continued access to basic services and recreation, and take place only in sanitary and temperature-controlled cells. *See* 2026 NDS § 2.9, II; Ex. 2, DH at 9. This conduct further violates performance-based standards set by the American Correctional Association, an accreditation body for the corrections industry. Am. Corr. Ass'n, *Performance-Based Standards and Expected Practices for Adult Correctional Institutions* (Mar. 2021) (hereinafter "ACA"), 5-ACI-4B-01, -02, -04, -08, -09, -10, -12, -14, -16, -17, -19, -23, -24, -28, -30.

75. Defendants' practices likewise violate ICE's standards requiring that people may be placed in disciplinary segregation only "following a hearing where the detainee is found to have committed a prohibited act, and only if alternative measures are insufficient to address the behavior," 2026 NDS § 2.9, II(B), and requiring that a written order "shall be completed and approved by the facility administrator or designee before placing a detainee in administrative segregation" and "provided to the detainee within 24 hours of placement and its contents

communicated to them in a language or manner they understand." 2026 NDS § 2.9, II(A)(2); *see also* ACA 5-ACI-4B-08, -09. None of this is taking place at Miami Correctional.

76. State and Federal Defendants' use of solitary confinement for detained immigrants causes significant risk of harm—both immediate and long-term. Defendants' practice of subjecting detained immigrants to prolonged and indefinite terms in solitary confinement is widely considered to be unacceptable and tantamount to torture.[38] There is a widespread clinical consensus that solitary confinement causes severe and lasting psychological and physical harm stemming from extreme social isolation, sensory deprivation, and forced idleness and immobility.[39] This can include a range of harmful effects, such as depression, anxiety, panic, rage, paranoia, lack of impulse and emotional control, hypersensitivity to stimuli and hallucinations, and even psychosis. Placing individuals in solitary confinement, whether single or double-celled, exacerbates existing mental health issues, can cause people to decompensate and experience serious new mental health symptoms, and significantly increases chances of suicide and/or self-harm.[40]

[38] In 2016, the National Commission on Correctional Health Care issued guidance to correctional health officials explaining that a period of solitary confinement beyond 15 consecutive days is "inhumane, degrading treatment, and harmful to an individual's health." Nat'l Comm'n on Corr. Health Care, *Position Statement: Solitary confinement (Isolation)* (2016). In 2015, the United Nations General Assembly adopted the Nelson Mandela Rules, prohibiting indefinite and prolonged solitary confinement, which it defines as a period beyond 15 consecutive days, and considers to be a form of torture. *See* United Nations, *United Nations Standard Minimum Rules for the Treatment of Prisoners (the "Nelson Mandela Rules")* (2016) ("In no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhuman or degrading treatment or punishment," including "[i]ndefinite solitary confinement," and "[p]rolonged solitary confinement.").

[39] *See, e.g.*, Stanford Univ. Hum. Rts. in Trauma Mental Health Lab, *Mental Health Consequences Following Release from Long-Term Solitary Confinement in California: Consultative Report Prepared for the Center for Constitutional Rights* 15-25 (2017) (finding that upon release from solitary confinement, individuals are more likely to experience panic disorders, traumatic stress syndromes, hypervigilance and worry, and a decreased motivation to seek social connections).

[40] *See*, *e.g.*, Kayla James & Elena Vanko, *The Impacts of Solitary Confinement*, Vera Inst. (April 2021), at 2 (collecting sources).

77. The harm of solitary confinement can continue even after people are released from solitary. People who have been released from detention continue to experience nightmares and physical manifestation of stress and trauma such as hair loss and skin conditions. They are also at risk of experiencing long-lasting and life-threatening physical consequences, including an elevated risk of suicide and mortality.

**3. Excessive and Prolonged Lockdowns**

78. By policy and practice, acting in concert, State and Federal Defendants regularly inflict the harms of solitary confinement in bulk, imposing severe and extended "lockdowns" on whole blocks of detained immigrants, subjecting them to conditions indistinguishable from solitary confinement doled out as "discipline."

79. During lockdowns, Defendants subject detained immigrants to conditions that approximate solitary confinement. Defendants force detained immigrants to stay inside their cramped, concrete cells for nearly 24 hours per day for multiple days, allowing them to leave only to shower every few days. Defendants deny detained immigrants any opportunity for basic human interaction beyond their cellmates, who may not speak the same language. Detained immigrants eat every meal in their cells during lockdown, and these meals arrive late enough that they experience significant hunger. On some occasions, officers skip distribution of meals entirely. State Defendants' staff sometimes bring ice-cold or spoiled food.

80. Defendants fail to clean cells during lockdowns, so detained immigrants are trapped in filth without access to cleaning supplies or hygiene products. During a 10-day lockdown, Plaintiff Kemoye Muslar endured three days with his cell flooded over with sewage. He spent those days carefully attempting not to slip and fall into human waste and physically distancing himself from the sewage as much as possible to avoid catching an illness.

81. Defendants often impose lockdowns for reasons that have nothing to do with security or operational concerns; rather, Defendants often impose these mass lockdowns with no legitimate justification at all. Defendants sometimes provide detained immigrants with no information at all about the reason for lockdowns, even when they drag on for days.

82. State correctional staff sometimes impose lockdowns as a result of chronic understaffing at the facility—a problem that State and Federal Defendants are well aware of yet refuse to address.

83. Defendants also regularly use lockdowns as a form of "mass punishment," sometimes in retaliation for alleged misbehavior by only one or two people in a cell block. In a recent incident, guards harshly grabbed a detained immigrant and sent him to solitary confinement. Some of his fellow detainees yelled at the guards from their cells to stop because they believed the treatment was unfair. The entire cell block was collectively punished with a multiple-day lockdown.

84. Defendants' lockdowns place detained immigrants in danger. If a medical or other emergency arises, detained immigrants have no way to get the attention of State Defendants' correctional staff beyond yelling and banging on their cell doors. When one man experienced chest pain and could not breathe during a lockdown, people on his cell block had to bang on their doors trying to get the attention of correctional staff. Defendants' practice of placing two people in one already-cramped cell during lockdown—or "double-celling"—can also magnify the stress and frustration of lockdown and expose detained immigrants to serious risk of harm or violence.[41]

85. Defendants often do not permit detained immigrants to visit the medical office during lockdown, so they rely on State Defendants' staff to bring needed medication to their cells.

---

[41] *See* Thompson & Shapiro, *supra* note 37.

But State Defendants' staff generally fail to do so in a timely fashion. State Defendants delay and/or deny detained immigrants prescription medications, which can exacerbate pre-existing medical and mental health conditions. As a result, people fear for their health and safety during lockdown.

**4. <u>Unreasonable Use of Force and Staff Abuse</u>**

86. By policy and practice, Federal and State Defendants subject detained immigrants to explicit, rampant, and abusive racial and xenophobic slurs by State Defendants' officers at the prison.

87. Detainees report that State Defendants' staff treat them like caged animals or worse by regularly threatening physical harm and engaging in unreasonable uses of force.

88. Staff members abuse detained immigrants with racist and xenophobic language, calling them "a plague," professing that they "hate Latinos and Mexicans," and telling them "we don't want you here," "f-ing immigrant, go back to your country," or to "go back to your country, you [n-word]." When detained immigrants seek medical help in their native languages, Defendants' staff have said, "this is America, you need to speak English," or words to that effect, and sent them away.

89. State Defendants' staff threaten detained immigrants, including with death. Correctional staff told one detained person that his "corpse will be sent back to [his] country."

90. State Defendants' staff also regularly physically abuse and use other force against detained immigrants, including tasing and pepper spraying people. Recently, State Defendants' correctional staff pepper sprayed a detained immigrant five times, physically assaulted him twice while he was restrained, and then placed him in solitary confinement for declining to go to a medical appointment. Another man was pepper sprayed shortly after returning from the hospital

after suffering a severe epileptic seizure and injuries, and while still suffering the after-effects of his seizure and injuries.

91. State Defendants' staff have engaged in physical beatings and sexually groped detained immigrants.

92. The Federal and State Defendants' rampant physical and mental abuse of detained immigrants at Miami Correctional has no legitimate justification. Defendants' misconduct also violates ICE's Detention Standards, which plainly prohibit the physical abuse occurring at Miami Correctional and bar the use of force except in very limited circumstances and only "after all reasonable efforts to resolve a situation have failed." 2026 NDS § 2.8.I. These standards also require guards to "use only the amount of force necessary" to gain control of the detainee, ensure safety of detained immigrants and staff, prevent serious property damage, and "maintain the security and orderly operation of the facility." 2026 NDS § 2.8.I. Staff must "attempt to gain the detainee's willing cooperation, communicating in a language or manner they understand, before resorting to force." 2026 NDS §2.8.II(A)(2). Correctional staff are further prohibited from "[s]triking a detainee for failing to obey an order," or "[u]sing force against a detainee offering no resistance." 2026 NDS 2.8.II(C).[42] And Defendants' abuse of detainees likewise violates the American Correctional Association's standards concerning use of force and restraints. *See* ACA 5-ACI-3A-35 (the use of physical force is "a last resort," and "[i]n no event is physical force justifiable as punishment"), -16 ("instruments of restraint . . . are never applied as punishment").

[42] Defendants' rampant use of force also violates State Defendants' correctional standards applicable to state prisoners, which requires physical force by personnel to be restricted to "[o]nly that force necessary to control an inmate," 210 Ind. Admin. Code 3-1-13(c) (2025), and strictly prohibit corporal punishment and retaliatory, degrading, or revenge-based disciplinary action. Ind. Dep't of Corrs. Pol'y & Admin. Proc., 02-04-101(IV)(A)(4) (May 1, 2023).

93. Federal and State Defendants are aware of the rampant staff misconduct and abuse, including as a result of multiple lawsuits, yet fail to take effective action to prevent and address it, which causes significant physical and mental harm to immigration detainees.

### C. Medical and Mental Health Care at Miami Correctional is Dangerously Inadequate

94. In addition to subjecting detained immigrants at Miami Correctional to unconstitutional punishment and harsh prison conditions, Federal and State Defendants place detained people in physical danger by refusing to provide for their most basic human needs, including access to adequate medical and mental health care.

95. Detained immigrants at Miami Correctional have a wide range of serious health conditions that require consistent medical attention and prescription medication, such as chronic conditions like diabetes, cardiovascular disease, and chronic lung disease; acute needs caused by infectious diseases; injuries incurred before or during detention; and mental health conditions and suicidal ideation. But Miami Correctional's medical system is broken at every stage, subjecting the people detained there to grievous harm.

96. Tragically, within one year, at least two detainees have already died. Scores of other detained people have experienced acute medical and mental health distress. Defendants' well-known policies and practices—which violate both the constitution and well-established ICE standards—are directly to blame.

#### 1. Inadequate Medical Staffing

97. State Defendants have long known that Miami Correctional's medical staffing is deficient and puts patients at serious risk of harm. IDOC nevertheless entered into a contract with Defendant ICE to provide medical care for an additional 1,000 detained immigrants, without hiring sufficient staff to provide the medical, dental, and mental health care needed to adequately serve

this population. Shortly after entering into this contract, State Defendants even eliminated financial understaffing penalties against the third-party medical contractor responsible for hiring medical staff at the facility.

98. Almost immediately, the growth in population outpaced the capacity of the limited medical staff hired to serve detained immigrants. Medical staff report working long hours to attempt to meet the medical needs of the growing detainee population, but understaffing makes it impossible to keep up.

99. When medical staff informed managers that they were "drowning," the managers told them to "just . . . care less."[43]

100. Defendants' failure to hire and retain sufficient medical staff and contractors has continued throughout this year. The agreement between IDOC and Centurion for medical staffing for ICE detainees at Miami Correctional required 29 "full-time equivalent" medical positions at Miami Correctional, including 23 nurses (both RNs and LPNs) for ICE detainees alone. The entire prison had only 19 nurses total—for hundreds of ICE detainees *and* more than 1,000 state prisoners—as of February 2026.[44] Likewise, the agreement required three qualified mental health professionals to work specifically with detained immigrants. For months, Defendants never came close to hitting these marks. This chronic understaffing puts everyone held at Miami Correctional at risk.

---

[43] Kristine Philips, *Deaths, delays, 'fake' data: How Braun's ICE prison deal fueled a medical crisis*, Indianapolis Star (updated July 24, 2026, at 15:11 ET), https://www.indystar.com/story/news/investigations/2026/07/20/mike-braun-ice-prison-deal-fueled-medical-crisis-at-miami-speedway-slammer-amid-deaths-backlogs/89824424007/.

[44] *Id.*

101. Between October 2025 and approximately June 2026, the entire Miami Correctional facility employed only two medical employees licensed to diagnose illnesses and prescribe medications for up to 1,000 people: a doctor and a nurse practitioner.[45]

102. Multiple medical staff have quit their jobs at Miami Correctional over the past year because of concerns about being unable to provide adequate medical care with such minimal staffing.

103. Many of the systemic and dangerous practices at Miami Correctional described below—the failure to conduct adequate health intake screenings, the failure to continue essential prescription medications, the failure to provide adequate medical and mental health treatment, and the failure to provide adequate emergency responses—are a direct result of Defendants' failure to hire and retain adequate medical and mental health staffing at Miami Correctional.

**2. <u>Inadequate Screening Procedures</u>**

104. Federal and State Defendants systematically fail to provide detained immigrants with adequate medical and mental health screenings and intakes when they arrive at Miami Correctional, which places detained people and staff at serious risk of harm.

105. Initial medical and mental health screenings and intakes serve a critical function in corrections facilities, including by identifying people with urgent and chronic medical and mental health needs and preventing the spread of infectious diseases. Defendant ICE's detention standards require that, upon intake, "a healthcare practitioner shall provide detainees an initial medical, dental and mental health screening and ask for information regarding any known acute, emergent, or pertinent medical conditions (past or chronic), including history of mental illness – particularly prior suicide attempts or current suicidal/homicidal ideation or intent – and any

[45] *Id.*

disabilities or impairments affecting major life activities." 2026 NDS § 4.3.II(D)(1). In addition, detained immigrants are to receive a screening for Tuberculosis and other infectious diseases. 2026 NDS § 4.3.II(D)(3); Ex. 2, DH at 10.

106. Contrary to these policies, State Defendants' corrections staff—not licensed medical providers—sometimes conduct medical screenings themselves without sufficient training or oversight. *See* ACA 5-ACI-6B-02 ("Clinical decisions are the sole province of the responsible health care practitioner and are not countermanded by non-clinicians."), -03 ("[H]ealth care services . . . are provided by qualified health care staff[.]").

107. Even when screenings are conducted by medical staff, Defendants lack adequate policies and procedures for reviewing the medical and mental health history of arriving detainees and triaging based on the urgency of medical need. Screenings are often rushed, lasting only a few minutes, compromising the accuracy of the medical information recorded in detainees' multi-page medical screening forms, which contain nearly 50 questions. The screening assessments used are also incomplete and fail to direct clear action that must be taken in response to clear medical need. One detained man who has suffered from epilepsy since childhood told the nurse about this condition at intake, but facility medical records do not reflect his diagnosis. He went without his epilepsy medication for several weeks at Miami Correctional and was assigned to a top bunk where he was at risk of falling during a seizure.

108. Defendants have also failed to implement adequate policies and procedures to ensure that initial screenings are confidential, contrary to ICE's detention standards requiring facilities to provide detained immigrants with "basic health examination, treatment, and communication in private." 2026 NDS § 4.3.II(B); *see also id.* § 4.3.II(P) ("All medical personnel . . . shall protect the privacy of detainees' medical information to the maximum extent possible").

Instead, State Defendants' staff often conduct initial screenings in public, within earshot of other detained people and corrections officers.

109. Defendants also lack adequate policies and procedures to ensure effective communication during medical screenings and intakes. Staff often conduct these intakes without interpreters, and detained immigrants who have limited English proficiency cannot understand the staff or have difficulty communicating with them due to a language barrier. As a result, those with limited English proficiency either have no way to communicate their medical needs or cannot accurately communicate their medical needs, both key parts of any medical assessment.

110. While waiting to complete their medical screenings, Defendants confine detained people to a large holding cell, often with scores of other people and sometimes after long transport journeys, where they sleep on the floor and cannot shower. Detained immigrants are regularly told they cannot receive any medication, including necessary prescriptions, until the intake process is complete—a process that often takes multiple days.

111. In some cases, detained immigrants do not even receive their initial medical screening—including for highly contagious infectious diseases, like tuberculosis ("TB")—until they have already entered the general population, putting all people held at the facility (and staff) at risk. The risk of contracting and spreading TB within ICE detention has become a growing concern over the past year, as TB cases have been detected at multiple immigration detention facilities nationwide.[46]

---

[46] *See, e.g.*, *Tuberculosis Spawning in Crowded, Dirty ICE Detention Centers*, Am. Prospect (Aug. 18, 2025), https://prospect.org/2025/08/18/2025-08-18-tuberculosis-spawning-in-crowded-dirtyice-detention-centers/ (mentions TB cases at facilities in Alaska (Anchorage), California (Adelanto), Arizona (Eloy), Denver (Aurora), Tacoma (Northwest ICE Processing Center)); *Two cases of tuberculosis detected at El Paso ICE facility*, Tex. Trib. (updated Feb. 8, 2026, at 17:23 CT), https://www.texastribune.org/2026/02/07/ice-facility-el-pasotuberculosis/.

112. Even when detained immigrants manage to communicate their serious medical needs during their initial screening, they often receive little to no follow-up. They are often told to begin or continue medication, only to wait days or weeks to actually receive it.

3. **<u>Inadequate Continuity of Care</u>**

113. Defendants fail to ensure continuity of care when Defendants transfer a detained immigrant from another detention or correctional center to Miami Correctional. As a result, patient care is frequently interrupted, and detained immigrants new to Miami Correctional often do not receive the essential medications they were receiving at the prior facility. This disruption in care is foreseeable and places detained immigrants at unnecessary risk, not just from their ongoing medical conditions but also as a consequence of the abrupt termination of certain medications.

114. As an example, one detained person with epilepsy did not receive his medication for 41 days after transferring to Miami Correctional, even though he was receiving the medication at the jail he was detained in just before being transferred to Miami. Without this medication, he feared and was at risk of having a seizure and injuring himself.

115. Another man arrived at Miami Correctional with prescription pills for a head injury he suffered before his detention, but staff refused to provide them and instead threw them away.

116. Another man was receiving treatment for a urinary issue at a prior ICE facility and had a surgery scheduled. At Miami Correctional, Defendants' medical staff stated he would need to "start over" his treatment, in part because Defendants did not have his records from the other facility. The "starting over" process has taken months.

117. Defendants also consistently fail to provide a more comprehensive medical and mental health assessment within 14 days of a person's arrival at Miami Correctional, as is required by both the Detainee Handbook and ICE's National Detention Standards. *See* Ex. 2, DH at 10;

2026 NDS § 4.3.II(F). The National Detention Standards specifically require the assessment to include "a physical examination and mental health screening" conducted "by a qualified provider (physician, physician assistant/associate, nurse practitioner)." 2026 NDS § 4.3.II(F). Detained people rarely see such a provider at all within the first 14 days of their detention at Miami Correctional, let alone receive a comprehensive health assessment. This deprives detained immigrants of the access to care needed to safely manage their symptoms.

### 4. <u>Broken System for Requesting Medical and Mental Health Care</u>

118. Defendants' policies and practices fail to afford detained immigrants timely and reliable medical care for urgent medical needs and maintenance of chronic conditions, causing serious harm to the immigrants civilly detained at Miami Correctional.

119. State Defendants' Detainee Handbook directs detained immigrants to submit healthcare requests for any medical problems, including sick call requests, chronic care requests, and requests for mental health care. These requests are then supposed to be reviewed by Defendants' medical staff and scheduled "at the earliest available appointment time." Ex. 2, DH at 10.

120. The National Detention Standards require Miami Correctional to receive and triage healthcare request slips within twenty-four hours of receipt and to determine when to see the detainee based on the acuity of the problem. 2026 NDS § 4.3.II(I).

121. In practice, Defendants' medical staff fail to timely review these requests, if they review them at all. Recent reporting on medical care at Miami Correctional revealed massive medical care backlogs, apparently driven largely by understaffing. In July 2026, the Indianapolis Star reported that healthcare requests have "skyrocketed" since immigration detention began at the

facility.[47] Defendants' medical staff also report that, as backlogs have "soared to the hundreds," Centurion Health reported lower numbers (including "no backlogs at all over several months") which were false.[48]

122. Detained immigrants report that they typically must submit several healthcare requests to receive an appointment or response, and they often receive no response at all. At best, some detained immigrants are seen multiple days after making a request, but many routinely wait weeks to be seen. For example, one man experienced intense leg pain and inflamed leg wounds near the site of a spider bite he had suffered years earlier. The pain was so intense that he could barely walk from his cell to the food hall. He submitted multiple handwritten medical requests for help during the span of one to two weeks, but Defendants provided no medical attention. Eventually, an officer took a picture of his legs and the open and oozing wounds and sores. Once the officer showed the picture to a nurse, the man finally received treatment for the wounds.

123. Plaintiff Cynthia Acevedo requested a physical examination and HIV testing after she was sexually assaulted by another detained person in July 2026. Defendants did not conduct a physical examination, conduct a rape kit, nor did they provide medication to prevent possible transmission of HIV. For over a month, Defendants did not test Ms. Acevedo for HIV. Although a blood sample was later taken, Ms. Acevedo still does not know whether they have tested her for HIV, and she has not received any test results.

124. Defendants fail to continue care even after detained immigrants have been transported to an offsite hospital for emergency care and return to Miami Correctional with ongoing healthcare needs. Detainees do not receive follow-up appointments unless they

---

[47] Phillips, *supra* note 43.
[48] *Id.*

affirmatively request them; then they are forced to rely on the slow and broken sick-call request system, which further exacerbates their suffering and risk of long-term harm.

**5. <u>Deficient Quality of Care</u>**

125. By policy and practice, Defendants also fail to provide medical and mental health treatment to detained immigrants that meets the necessary professional standards of care.

126. Defendants fail to meet the professional standards of care in multiple ways. First, Defendants fail to use effective communication when treating patients, just as they fail to do when screening them. Patients who have limited English proficiency (LEP) are generally not provided interpreters, even though most clinical staff at Miami Correctional only speak English. Patients with limited English proficiency are forced to either muddle through conversations about their health issues in a language they do not fully speak or understand, or seek help from other detained people, who sometimes try to translate for each other. Plaintiff Cynthia Acevedo, a native Spanish speaker who speaks only limited English, has had many medical appointments conducted in English that she has had difficulty understanding. This practice plainly violates ICE's National Detention Standards, which require the provision of language services, including interpretation and translation. *See* 2026 NDS § 1.1.I; 1.1.II(B).

127. Defendants also fail to stock basic and necessary medical supplies to treat the population they have in their custody. Former medical staff employed at Miami Correctional reported frequently running out of crutches, glucose test strips, insulin syringes, and colostomy bags.

128. Defendants fail to timely meet with detained immigrants after prescribing new medications and/or adjusting the dosage of medication to monitor effectiveness, manage adverse side effects, and follow up with patients with poor medication adherence.

129. Defendants also routinely fail to provide detained people with access to needed medication and treatment on a timely or consistent basis. One detained man has not received HIV medication in nearly four months at Miami Correctional, despite informing medical staff about his diagnosis and need for medication and despite his visibly declining health. Extended interruptions in medication can lead individuals with HIV to develop severe illness or even AIDS.

130. Defendants refuse to provide Plaintiff Cynthia Acevedo with Dilantin, the epilepsy medication she had used for years before her arrest to manage her seizures. Medical staff told Ms. Acevedo that the state does not cover Dilantin and instead switched her to Keppra, a new medication that does not effectively control her seizures. To make matters worse, Defendants have repeatedly denied Plaintiff Cynthia Acevedo her daily doses of Keppra because the medical staff frequently runs out of stock. As a result, Ms. Acevedo sometimes goes days without any medication. Her seizures have grown more frequent and more severe, causing her to fall off her bed, hit her head, break her teeth, and become incontinent.

131. Defendants further interfere with access to quality care by correctional staff failing to take detained immigrants to medical and mental health appointments and failing to distribute medication on time and in the correct dosages prescribed. Defendants attempt to hide these failures by pressuring detainees to sign refusal forms falsely indicating that the patients chose not to take their medication or attend medical appointments. *But see* 2026 NDS § 4.3.II(L) (requiring medication to be distributed according to the specific instructions and procedures established by the healthcare provider.").

132. Detained immigrants who require specialty healthcare do not receive it on a timely basis or, in some cases, at all. Multiple people have experienced eye pain and vision problems that require treatment by an eye doctor beyond the expertise of Defendants' onsite medical staff at

Miami Correctional. None of these individuals has seen an eye doctor for months, and one was told that immigrant detainees are not permitted to see specialists at all. One man has even gone blind in one eye while waiting to see an eye specialist for months. This runs contrary to ICE's Detention Standards, which require that every detention facility provide "specialty health care." 2026 NDS § 4.3.II(A).

133. Defendants also fail to take adequate measures to protect detained immigrants with serious mental illness whose needs exceed the treatment capability of staff at Miami Correctional. Detained immigrants with acute symptoms of serious mental illness are frequently left to decompensate in their cells rather than being transferred to outside mental health facilities equipped to provide appropriate treatment. 2026 NDS § 4.3.II(S)(2).

**6. <u>Failure to Respond to Medical Emergencies</u>**

134. ICE's National Detention Standards require that "[d]etention staff and health care staff will be trained to respond to health-related emergencies within a 4-minute response time." 2026 NDS § 4.3.II(K). Defendants fall far short of this standard on a routine basis, putting detained immigrants at serious risk of harm.

135. The Detainee Handbook includes only two sentences as to medical emergencies: "Detainees experiencing severe pain or injury should report to any staff member immediately. Staff will notify the Medical Department of the emergency." Ex. 2, DH at 11.

136. Despite these instructions, State Defendants' correctional staff regularly fail to react in accordance with medical and correctional standards when emergencies arise. For instance, correctional staff wait until their supervisors arrive to even begin the process of summoning medical staff. Correctional staff are often absent and unreachable in an emergency, especially during lockdowns or when an emergency occurs in a detainee's cell. Federal and State Defendants

compound this danger by failing to ensure emergency buttons or intercoms are readily available in every cell or block. Plaintiff Cynthia Acevedo suffers from frequent and severe seizures, but lives in a cell without a functioning emergency call button and therefore has no way to call for help.

137. Even when State Defendants' correctional staff do respond to the scene of an emergency, they respond callously to those experiencing distress.

138. One detained man observed IDOC correctional staff take one to two hours to respond to another person who consistently fell out of his wheelchair while experiencing seizures. When another elderly man had a medical emergency in his cell on the upper floor of his cell block and could not stand, staff refused to go up the stairs to get the man medical assistance, yelling at him to walk downstairs himself. One detained man witnessed this and tried to carry the elderly man himself, until staff eventually dragged him down the stairs to the medical unit.

139. Former medical staff report that responding to medical emergencies at Miami Correctional is particularly difficult given the size of the facility and chronic understaffing. Responding to a medical emergency in the housing units requires that both medical and correctional staff traverse the equivalent of three football fields. This distance also makes it difficult for medical staff to carry the requisite medical equipment to the location of the emergency.

140. Defendants also fail to ensure adequate emergency responses for detained immigrants who require offsite medical care. Upon information and belief, while State Defendants used to have a contract to transfer people in emergencies via helicopter, State Defendants ended that contract.

141. One detained man who was stabbed in Miami Correctional waited nearly an hour for an ambulance to arrive to transport him to the local emergency room in Kokomo, Indiana.

142. Defendants forced one detained man to wait two days to go to the hospital, even though he exhibited telltale signs of a collapsed lung. By the time he reached the hospital, he was rushed into emergency surgery, admitted to the ICU, and told by doctors he was lucky to be alive.

**7. Exacerbating Risk of Suicide for Detainees With Mental Health Issues**

143. Defendants' segregation policies, procedures, and practices are particularly dangerous and deadly for detained immigrants with significant medical and mental health conditions. Defendants routinely place detained immigrants with mental illness and/or who are at risk of suicide in punitive isolation units for behaviors that are a manifestation of their mental illness or for no reason at all. Defendants also fail to ensure proper oversight and care to prevent people held in solitary confinement from decompensating and engaging in acts of self-harm or suicide.

144. For example, Defendants denied Plaintiff Sergei Vasenin timely access to his anti-depression medication and mental health services for several weeks while subjecting him to solitary confinement. Without access to timely mental health care, Plaintiff Sergei Vasenin's mental health deteriorated in segregation and he experienced increasing suicidal ideation.

145. State and Federal Defendants also fail to ensure effective suicide prevention policies and practices. Several detained people regularly express thoughts of self-harm and suicide because of the conditions to which they are subjected. State Defendants aggravate detained immigrants' mental health conditions and increase risks of self-harm and suicide by ignoring or taunting them, rather than ensuring detained immigrants' timely access to mental health treatment and utilizing suicide prevention protocols.

**8. Tragic Deaths and Near Deaths Resulting from Inadequate Medical and Mental Health Care**

146. Defendants' abysmal system of medical and mental health care has proved life-threatening.

147. Mr. Lorth Sim, a 59-year-old Cambodian who arrived in the United States in the early 1980s, died at Miami Correctional on February 16, 2026. At the time of his death, Mr. Sim, a Type 2 diabetic, had been detained for six weeks at Miami Correctional. According to ICE's own reporting, Mr. Sim told a nurse during his intake screening about his history of diabetes that he treated with metformin, a medication that controls blood sugar levels.[49] Despite having this information at intake, a provider at Miami Correctional waited nearly 10 days to prescribe Mr. Sim metformin and order blood glucose checks.

148. In the six weeks he was detained at Miami Correctional before his death, Mr. Sim never received the metformin, nor did he receive any blood glucose checks. After his death, Mr. Sim's family sought an independent autopsy, which found "plaque blockages in his arteries" and that, "[i]n the hours before he died, his blood sugar surged to 300 mg/dL," "well above the level at which he should've received urgent medical care."[50]

149. Six weeks later, Mr. Tuan Van Bui, a 55-year-old man from Vietnam, died at Miami Correctional on April 1, 2026. According to ICE's own reporting, Mr. Van Bui was transferred to Miami Correctional from a detention facility in Pennsylvania, where medical providers had identified him as having a number of serious health issues, including "histories of asthma and hypertension," "use of a cane," "history of hyperlipidemia, stroke in 2024, and elevated blood

[49] U.S. Immigr. & Customs Enf't., *Detainee Death Report: SIM, Lorth*, https://www.ice.gov/doclib/foia/reports/ddr_SIM.pdf.

[50] Kristin Phillips, *He survived a genocidal regime – and died in ICE detention at an Indiana prison*, Indianapolis Star (July 20, 2026, at 5:02 ET), https://www.indystar.com/story/news/investigations/2026/07/20/ice-detainee-lorth-sim-miami-correctional-facility-medical-failures-centurion-refugee-immigration/90518557007/.

pressure."[51] At that facility, Mr. Van Bui "was prescribed medications for hypertension and high cholesterol."

150. Despite these serious health problems, ICE's records show that Mr. Bui received medical care on only two occasions during the four months he was detained at Miami Correctional: on November 19, 2025, when he received a routine intake screening, then on March 23, 2026—one week before his death—when a physician "documented knee swelling and osteoarthritic changes, diagnosed chronic obstructive pulmonary disease, and continued his chronic care plan."[52]

151. On or about April 1, 2026, other detained people found Mr. Bui unresponsive in his cell and had to run down the hall to call for emergency medical assistance. They tried to help Mr. Bui themselves as critical minutes passed before a State corrections officer arrived and called for medical help. As more time passed, other detained people reported seeing medical staff taking their time as they walked casually to Mr. Bui's unit. When medical staff finally arrived, detained people watched staff struggle to provide emergency care, with one detained man compelled to assist a nurse in order to try to revive his friend, Mr. Bui, by doing mouth-to-mouth resuscitation. Those efforts were not successful.

152. Defendants' broken mental health care system is exemplified by the recent attempted suicide of a detained man from Iraq, which occurred less than a week after his arrival at Miami Correctional. Immediately after his arrival on or around October 9, 2026, the man began expressing that he wanted to kill himself and displaying other visible signs of psychological distress, like pacing, talking to himself, shaking, and flushing his food down the toilet. For three days, other detained immigrants in the man's cell block repeatedly alerted various members of

---

[51] U.S. Immigr. & Customs Enf't., *Detainee Death Report*: *Tuan Van*, https://www.ice.gov/doclib/foia/reports/ddrTuanVanBui.pdf.
[52] *Id.*

State Defendants' staff—including correctional officers, sergeants, and mental health staff—of the man's condition and asked that someone help him. Staff dismissed their concerns, promising only to move him to a solitary confinement wing to "control" him. State Defendants' staff also waited two days to bring in a mental health provider to speak with the man.

153. On October 12, 2026, the man broke the TV in his cell, and officers responded by locking him in the cell alone with the broken TV. Officers and other detained immigrants observed the man use the shards of the broken TV screen to cut his wrists, but the man remained locked in his cell alone. Shortly thereafter, the man hung himself from the top bunk in his cell using TV cables. Defendants eventually took the man to the hospital.

154. On information and belief, the man remains fighting for his life in critical condition in an Indiana hospital. Further details have not been confirmed. Notably, Federal Defendants recently rescinded a policy that required reporting of the deaths of newly released detainees—a policy designed "to ensure that ICE could not avoid accountability for deaths by releasing severely ill people from custody" at the last minute.[53]

### D. Detained Immigrants at Miami Correctional Are Consistently Denied Basic Necessities

#### 1. <u>Unsanitary and Unsafe Facilities</u>

155. Defendants force detained immigrants at Miami Correctional to live in filthy and unsanitary conditions. The buildings housing immigration detainees at Miami Correctional have significant plumbing issues, which leads to flooding of sewage. As a result, detained individuals are forced to live in cells flooded with human waste. Shower facilities are covered in mold. Insects crawl on the walls.

---

[53] Edward Helmore, *Memo orders ICE to stop reporting deaths of newly released detainee*, The Guardian (Jun. 5, 2026, at 14:54 ET), https://www.theguardian.com/us-news/2026/jun/05/ice-deaths-data-memo.

156. Defendants require detained immigrants to clean common areas and cells themselves. Defendants refuse to provide proper cleaning supplies, forcing detained immigrants to use their own personal soap and shampoo to try to clean and sanitize their living spaces. The only time correctional staff clean is when outside visitors, including congressional staff, visit the facility.

157. Other areas of the prison present safety hazards. Common areas leak when it rains, causing people to slip and fall, sometimes resulting in injury.

**2. <u>Inadequate Food and Water</u>**

158. State and Federal Defendants deprive immigrants detained at Miami Correctional of sufficient food. Detained immigrants receive meager portions and often go hungry. Detained immigrants lose significant amounts of weight because they do not receive adequate calories or nutrients. They are forced to supplement their food intake by purchasing food from the commissary. However, many people do not have the funds to afford commissary food and so go hungry.

159. Mealtimes are infrequent and inconsistent. Defendants force detained immigrants to eat breakfast at 3 or 4 a.m., then do not feed them again until almost 12 hours later. If detained people do not wake up when breakfast is called at such an early hour, they miss the meal.

160. The food Defendants do provide is of low quality, and sometimes inedible. It is often rotten or spoiled. Detained people have found rocks in their food. Unless they receive a special diet, people detained at Miami Correctional receive a dinner of bread, bologna, and peanut butter for days on end. Defendants often fail to provide dietary accommodations, such as by providing a halal diet. Detained immigrants say the meals they are served are worse than dog food. Corrections officers have remarked that they would not even serve that food to their pets.

161. Even when detained immigrants have enough money to purchase the expensive food available at commissary, the commissary is slow and inconsistent. Detained people report that they must wait weeks to make and receive commissary orders, and items are often out of stock.

162. Defendants fail to provide detained people with potable water. The only water available in their cells and in the intake area is from the sinks attached to the toilets, which makes them sick. If they want to avoid drinking this water, they must purchase bottled water from the commissary. One person reported that after a significant rainfall, water leaked from the ceiling into the cells and people drank that water out of desperation.

### 3. **Inadequate Hygiene and Clothing Items**

163. State and Federal Defendants refuse to provide detained immigrants with sufficient hygiene supplies, such as soap, shampoo, and nail clippers. People often run out of these items, and no one responds when they request more. At times, detained immigrants have not been provided basic hygiene items, including soap and toothpaste, free of charge, if they have money on their commissary balance. Instead, Defendants inform detained people that they must instead purchase these items from the commissary.

164. Defendants also do not provide detained immigrants with sufficient or appropriate clothing. Defendants provide ripped, dirty clothing upon arrival. The shoes that detained immigrants receive are made of flimsy rubber and inappropriate for walking through inclement weather. These shoes get easily worn down and slick, causing people to slip and fall and injure themselves, especially when they are forced to walk on the flooded floors or in the snow. Defendants do not provide detained people with weather-appropriate clothing, like hats or coats for cold weather. People are forced to wash their clothing in sinks, as detained people see officers washing dirty mop heads along with their clothes in the laundry machines at the facility.

### 4. Extreme Limitations on Outdoor Time and Recreation

165. Defendants' policies and practices provide detained immigrants with, at a minimum, five hours of outdoor recreation per week. *See* Ex. 2, DH at 26; *see also* 2026 NDS § 5.2.II.(A) (requiring "[w]eather permitting, detainees shall have access for at least one hour per day, a minimum of five days per week."). In reality, Defendants often provide even less outdoor time than required under their already-constitutionally insufficient policy. Some weeks, detained immigrants get only one hour outside or no outdoor time at all. During the colder winter season, some people did not receive any outdoor recreation for months on end. When they do receive outdoor recreation, it is announced without warning and at inconsistent times of the day, sometimes so early in the morning that most detainees have not yet woken up. The opportunity for recreation is also hindered by the fact that detained immigrants receive almost none of the programming afforded to prisoners on the other side of the facility, like educational opportunities[54] and addiction recovery services.[55]

### 5. Interference with Access to Counsel and Family through Online Detainee Locator

166. As of September 2026, Federal Defendants have stopped publicly reporting where they hold people subject to final removal orders (with the exception of a few facilities that are under court orders), deleting those individuals from their Online Detainee Locator System.[56] As a result, the families and attorneys for dozens (if not hundreds) of people held at Miami

[54] *See*, *e.g.*, *Indiana Tech, Miami Correctional Facility collaborating as part of Second Chance Pell Grant program*, Ind. Tech (June 6, 2023), https://www.indianatech.edu/news/indiana-tech-miami-correctional-facility-collaborating-as-part-of-second-chance-pell-grant-program/.

[55] IDOC Miami Correctional Facility (@IDOC Miami Correctional Facility), Facebook (June 10, 2026, at 17:12 ET), https://www.facebook.com/share/p/1EShMK4zq8/ (Miami Correctional Facebook post about "Recovery While Incarcerated" program).

[56] Ryan J. Foley, *AP Exclusive: ICE hides locations of thousands of detainees with final removal orders*, AP (Sep. 21, 2026, at 16:41 CT), https://apnews.com/article/ice-detainee-locator-disappear-removal-orders-c3329a70bce424879bc5880b286c019c.

Correctional have no way to find them. Federal Defendants block these individuals from access to the outside world, interfering with their ability to stay in contact with loved ones and to consult and work with attorneys on legal challenges to their removal orders and for habeas petitions.

**E. Defendants Purposefully and Knowingly Subject Immigrants Detained at Miami Correctional to Abusive Conditions**

167. State and Federal Defendants are well aware of the inhumane conditions at Miami Correctional.

**1. Extensive Government and Media Scrutiny Has Placed Defendants on Notice**

168. Extensive media reporting has revealed the abuses suffered by immigrants held at Miami Correctional, from widespread failures in medical care to unwarranted violence at the hands of State guards.[57] An Indianapolis Star investigation detailed how "the state and its for-profit prison healthcare provider, Centurion Health, were woefully unprepared for the influx of [ICE] detainees" at Miami Correctional.[58]

169. Multiple lawmakers have also raised the alarm about the dire conditions at Miami Correctional. U.S. Representative André Carson, who visited the facility in April 2026, expressed serious concerns over the conditions at Miami Correctional—including inadequate medical care, frequent lockdowns, and mass punishment—and the tragic deaths and called for the end of immigration detention at the facility.[59] U.S. Representative Lauren Underwood likewise stated

[57] Phillips, *supra* note 50; *see also* Billal Rahman, *ICE Detainee Says He Was Left in Pool of Blood Before Being Pepper-Sprayed*, Newsweek (updated July 31, 2026, at 6:44 EDT), https://www.newsweek.com/ice-detainee-says-he-was-left-pool-blood-pepper-sprayed-12257856; *see also* Greg Constantine, *Indiana, ICE and the Destruction of Immigrant Families*, Mother Jones (July 16, 2026), https://www.motherjones.com/politics/2026/07/indiana-ice-and-the-destruction-of-immigrant-families/.

[58] Kristine Phillips, *Braun orders review at Indiana ICE prison after IndyStar investigation*, Indianapolis Star (July 24, 2026), https://www.indystar.com/story/news/investigations/2026/07/24/gov-braun-orders-review-indiana-prison-housing-ice-detainees-miami-correctional-facility-immigration/91041041007/.

[59] Kristine Phillips, *Lawmakers call on Braun to investigate deaths, backlogs at Indiana ICE prison,* Indianapolis Star (updated July 23, 2026, at 4:59 pm ET), https://www.indystar.com/story/news/investigations/2026/07/21/lawmakers-

that her December 2025 visit to Miami Correctional "exposed serious breakdowns in how people are tracked, cared for, and treated across ICE facilities."[60] Other state legislators have issued public statements expressing concern and calling for increased oversight over immigration detention at Miami Correctional.[61]

170. Following the Indianapolis Star's reporting regarding medical care failures at Miami Correctional, Governor Braun ordered an "internal audit" of the medical care for immigration detainees at Miami Correctional, acknowledging that there is "room for improvement."[62] This audit found that Centurion "misreported the severity of medical care backlogs at Miami Correctional Facility" and resulted in a $195,000 fine against Centurion and the firing of a staff member.[63] IDOC referred the findings of this audit to the Indiana Office of Inspector General for further investigation. The results of this audit, conducted by the State, must be provided to Federal Defendants per the Defendants' Agreement. *See* Ex. 1, Agreement, Art. § 7(D).

171. Statements by Federal Defendants not only confirm their knowledge of the punitive conditions at detention facilities like Miami Correctional, but suggest the conditions are intentional

---

call-for-investigation-of-immigrant-deaths-backlogs-at-miami-correctional-prison/90984447007/; *see also* Press Release, Congressman André Carson, *Congressman Carson Demands End to ICE Detention at Miami Correctional Facility* (Apr. 9, 2026), https://carson.house.gov/media/press-releases/congressman-carson-demands-end-ice-detention-miami-correctional-facility.

[60] Press Release, Congresswoman Lauren Underwood, *Underwood Details Systemic Issues During Inspections of ICE Detention and Processing Facilities in Chicago, Lombard, and Bunker Hill, Indiana* (Dec. 23, 2025), https://underwood.house.gov/media/press-releases/underwood-details-systemic-issues-during-inspections-ice-detention-and.

[61] *See, e.g.*, Press Release, Indiana House Democratic Caucus, *DeLaney urges full transparency after man dies in ICE custody at Indiana detention facility* (February 18, 2026), https://www.indianahousedemocrats.org/news/l5qygvq6noeop8dzbji41kh6t6rapj; *see also* Phillips, *supra* note 58.

[62] Phillips, *supra* note 58; Kristine Phillips, *Braun acknowledges 'room for improvement'' at prison housing ICE detainees*, Indianapolis Star (July 23, 2026), https://www.indystar.com/story/news/investigations/2026/07/22/gov-mike-braun-issues-miami-prison-ice-facility-immigration-centurion-trump-indiana/91007249007/.

[63] Phillips, *Medical backlogs at prison housing ICE detainees were 'misreported,' audit finds*, Indianapolis Star (updated Oct. 22, 2026, at 10:32 a.m. ET), at https://www.indystar.com/story/news/investigations/2026/10/16/ice-detention-center-medical-care-backlogs-at-miami-prison-misreported-audit-mike-braun/92022074007/.

and calculated to coerce immigrants into abandoning their legal rights and leaving the country. Defendant ICE's public statements warn immigrants that if you don't "turn yourself in," "you may have to spend several months in detention while you're awaiting removal."[64] Once immigrants are detained in punitive conditions at Miami Correctional, Federal Defendants repeatedly ask them to sign forms agreeing to voluntary departure, both in person and on the tablets they use to communicate with the outside world. The coercive message—accept "voluntary" departure or remain detained in abusive conditions—comes through loud and clear, and many give up their claims to relief from removal because they cannot endure any more.

### 2. <u>Defendants' Policies and Reporting Requirements Place Them on Notice</u>

172. Defendants also have knowledge of the abysmal conditions they impose on detainees, as their policies require that both State and Federal Defendants maintain a regular presence at the facility and engage in regular correspondence with detained people. State Defendants are tasked with day-to-day operations at the facility. *See* Ex. 1, Agreement, Art. § 1(A). Federal Defendants reportedly "make weekly rounds to the living areas of Detainees at MCF," a "schedule for [which] can be found in [detainees'] housing unit[s]." Ex. 2, DH at 24.[65]

173. Moreover, both State and Federal Defendants are required to routinely review and respond to concerns and grievances raised by detained people. *See* Ex. 2, DH at 12 ("[D]etainees may submit written questions, requests or concerns to MCF or ICE/ERO staff using the Detainee Request Form"); *id.* ("ICE staff are required to respond to all requests" directed to ICE/ERO staff); *see also* 2026 NDS § 6.2.II(F) (requiring State Defendants to "promptly forward all detainee grievances alleging staff misconduct to [Federal Defendants], and forward a copy of the report made to [Federal Defendants]"). Indeed, detained people frequently submit written requests and

---

[64] U.S. Immigr, & Customs Enf't, *Self-Deportation*, https://www.ice.gov/self-deportation (last visited Oct. 28, 2026).
[65] In reality, Federal Defendants maintain a more sporadic presence at the facility. *See infra* F.

electronic requests on their tablets to raise concerns about the inhumane treatment at Miami Correctional with State and Federal Defendants, and (albeit inconsistently) receive responses from both.

174. State Defendants must also comply with detailed reporting requirements to inform Federal Defendants of a wide range of day-to-day events at Miami Correctional. State Defendants must notify Federal Defendants of "all serious incidents" at the facility, including (to name a few) lockdowns, staff use of force, assaults requiring medical attention, suicide attempts, or "disturbances." Ex. 1, Agreement, Art. § 10(B); *see also* 2026 NDS § 6.2.II(F). The Agreement requires State Defendants to notify Federal Defendants of any detainee with a serious medical condition, any medical emergencies, any hospitalizations, any detainee deaths, and a variety of other medical incidents. *See* Ex. 1, Agreement, Art. §§ 5(B), 6(C)-(D), 6(J). State Defendants must also work closely with Federal Defendants on any placements in solitary confinement. *See supra* Sec. B.2. (citing 2026 NDS §§ 2.9.II(C)(3), 2.9.II.(M)(1)). As a result, both State and Federal Defendants have notice and knowledge of the punitive and dangerous practices occurring at Miami Correctional on a day-to-day basis.

175. Both State and Federal Defendants are required to conduct their own audits and inspections of the conditions at Miami Correctional. As stated in the Agreement, "DHS and ICE inspectors will conduct periodic inspections of the facility to assure compliance with ICE, DHS and other Federal standards." Ex. 1, Agreement, Art. § 2(A). Further, in response to Congressman Carson's concerns about the conditions at Miami Correctional, Federal Defendants stated that "Miami Correctional Facility is scheduled to receive their initial facility compliance inspection

from the ICE Office of Detention Oversight (ODO) within the Office of Professional Responsibility (OPR) from September 15, 2026, to September 17, 2026."[66]

### 3. Other Lawsuits Place Defendants on Notice

176. Since the beginning of 2025, at least 8 immigration detention facilities have already been subject to court orders requiring Federal Defendants to change the unconstitutional conditions imposed on immigration detainees. The abusive conditions at many of these facilities bear a strong resemblance to the conditions of immigration detention at Miami Correctional. For example, in March 2026, a court in the Northern District of California granted a motion for a preliminary injunction brought by a class of immigration detainees held at the California City Detention Facility—a former state prison—alleging unconstitutional punitive conditions and inadequate medical care. *See Gomez Ruiz v. U.S. Immigr. & Customs Enf't*, 834 F. Supp. 3d 835, 850 (N.D. Cal. 2026). Courts have subjected seven other facilities to similar orders.[67] This pattern of lawsuits has placed Defendants on notice that conditions like those at Miami Correctional are unconstitutional.

177. Likewise, State Defendants have faced dozens of lawsuits about the inhumane conditions at Miami Correctional. IDOC recently paid more than $1.2 million to settle 31 lawsuits challenging the abusive solitary confinement practices at Miami Correctional.[68] Many other

---

[66] Letter from David J. Venturella, Senior Official Performing the Duties of the Director, U.S. Immigr. & Customs Enforcement, to Congressman André Carson, U.S. House of Representatives (Jul. 23, 2026), https://indianacapitalchronicle.com/wp-content/uploads/2026/07/ICE-response.pdf.

[67] *See also Mercado v. Mullin*, No. 25-CV-6568 (LAK), 2026 WL 2874458, at *45 (S.D.N.Y. Sept. 24, 2026); *L.T., et al., v. United States Immigr. & Customs Enf't, et al.*, No. 5:26-CV-00322-SSS-SPX, 2026 WL 2338452, at *19 (C.D. Cal. Aug. 12, 2026); *H.C.R. v. Mullin*, 825 F. Supp. 3d 1267, 1307 (M.D. Fla. 2026); *D.N.N. v. Liggins*, 822 F. Supp. 3d 543 (D. Md. 2026); *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 825 F. Supp. 3d 858, 895 (D. Minn. 2026); *Gonzalez v. Noem*, No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025); *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025); V*asquez Perdomo v. Noem*, No. 2:25-CV-5065 (MEMF/SP) (C.D. Cal. Nov. 13, 2025), ECF No. 256 at 18–20.

[68] ACLU of Indiana, *supra* note 12.

plaintiffs, including both state prisoners and immigrant detainees, have also sued State Defendants over the unconstitutional conditions at the facility, including solitary confinement, inadequate medical and mental health care, failure to protect from violence, and deprivation of basic necessities.

### F. There is No Legitimate Justification for the Conditions Civil Detainees Endure at Miami Correctional

178. There is no justification for the inhumane conditions that Defendants impose on immigrants detained at Miami Correctional or, at the very least, Defendants' practices at Miami Correctional are excessive in relation to any legitimate governmental purpose.

179. Defendants' punitive treatment of detainees does not serve any public safety purposes. Many of the immigrants detained at Miami Correctional—including Plaintiffs Sergei Vasenin, Kemoye Muslar, and Cynthia Acevedo—have no criminal convictions at all. Among those who do, many have only limited records consisting solely of non-violent offenses. Regardless of criminal history, immigrants detained by Federal Defendants at Miami Correctional are not serving a sentence for any crime and their civil detention must be non-punitive. The treatment of immigrants detained at Miami Correctional not only violates their constitutional rights, but also runs afoul of ICE's own National Detention Standards (to which Defendants are contractually bound) and the policies set out in the Miami Correctional Detainee Handbook. These standards set out the Defendants' own view of the minimum conditions necessary to accomplish any legitimate governmental objective for the civil detention of immigrants, and the bleak and punitive conditions at Miami Correctional fall well short. *See supra generally* Sec. A-D. Even Defendants' own standards are offer a less restrictive alternative measures to accomplish any governmental objectives served by immigration detention, making Defendants' practices at Miami Correctional excessive in relation to those objectives.

180. State Defendants also subject people detained at Miami Correctional to conditions that violate their own state correctional laws and policies. Although state correctional policies for convicted prisoners do not apply to people in civil detention, like the putative Class, *see supra* Sec. A, these policies likewise demonstrate that no legitimate governmental interest justifies the inhumane conditions at Miami Correctional.

181. For example, Defendants' solitary confinement practices for detained immigrants violate State Defendants' correctional policies applicable to state prisoners. Medical care at Miami Correctional likewise falls short of state correctional standards. *See, e.g.*, 210 Ind. Admin. Code 3-1-11(f)-(g) (prisoners shall be "medically screened[] before placement in the general population," with a full medical assessment within 14 days of arrival); IDOC 01-02-101, at 3 (requiring that "the provision of healthcare shall include ... specialty care"); 210 Ind. Admin. Code 3-1-11(k) (requiring that "[a]ll medications shall be administered in the dosage and with the frequency prescribed"). These standards demonstrate that the abusive and dangerous conditions imposed by Defendants at Miami Correctional do not serve any legitimate non-punitive governmental objective or, at a minimum, are excessive in relation to any governmental purpose.

## INJUNCTIVE RELIEF

182. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

183. Plaintiffs and the putative Class are entitled to preliminary and permanent injunctive relief.

184. Defendants have acted, and threaten to act, to deprive Plaintiffs, and the putative class they seek to represent, of their constitutional and statutory rights.

185. Plaintiffs and the putative Class members have been and are being substantially and irreparably harmed by Defendants' unconstitutional policies and practices. In addition to the harm that flows inherently from the deprivation of their Constitutional rights, they have suffered and will continue to suffer physical and psychological injury. They have been and will continue to be subjected to serious risk of irreparable harm as the result of detention at Miami Correctional.

186. Defendants have been and are aware of the conditions and deprivations complained of herein.

187. Plaintiffs and putative Class members have no adequate remedy at law.

## CLASS ALLEGATIONS

188. Plaintiffs and putative Class members re-allege and incorporate by reference the preceding paragraphs of this Complaint.

189. Plaintiffs Sergei Vasenin, Kemoye Muslar, and Cynthia Acevedo bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1)(A) and (b)(2).

190. Plaintiffs seek to represent a class defined as: "All civil immigration detainees who are currently detained, or who will be detained, at Miami Correctional Facility" (the "Class"). Plaintiffs plan to seek emergency discovery of information relating to Miami Correctional, and if discovery or further investigation reveals that the putative Class should be expanded or otherwise modified, the named Plaintiffs reserve their right to amend the class definition or propose subclasses as necessary.

191. The putative Class is so numerous that joinder of all members would be impracticable. There are currently over 500 people held in immigration detention at Miami Correctional. The putative Class is also fluid, with people being brought to and removed from

Miami Correctional every day, making joinder of all members not just impracticable but impossible.

192. The putative Class consists of people detained and awaiting release, removal, or transfer to another immigration detention facility, which constitutes an inherently transitory population. While there is uncertainty as to how long any one plaintiff will remain at Miami Correctional, there will be a constant class of detainees suffering the constitutional and legal violations alleged in this Complaint as long as Miami Correctional remains in operation in its current state.

193. Defendants track those currently detained at Miami Correctional, all of whom are easily identifiable, for purposes of ascertaining the applicable class.

194. Several common questions of law and fact apply to all putative Class members. These common questions of fact include, but are not limited to, questions regarding whether Defendants have a policy and practice of punitive solitary confinement, mass lockdowns, and denial of basic necessities; and whether Defendants, by policy and practice, deny people detained at Miami Correctional of minimally adequate medical and mental health care,

195. Common questions of law include, but are not limited to, questions regarding whether detainees have objectively serious medical needs; whether Defendants' response to detainees' medical needs was objective unreasonable; whether Defendants acted purposefully, knowingly, or recklessly with respect to the risk of harm to detainees; whether conditions of detention at Miami Correctional are objectively unreasonable and/or punitive.

196. The named Plaintiffs' claims are typical of those of the class because they are detained at Miami Correctional and are subjected to the same punitive conditions of confinement and inadequate medical and mental health care policies and practices in violation of their and the

putative Class members' constitutional rights. All three plaintiffs have experienced a punitive prison environment, dangerously inadequate medical or mental health care, prolonged lockdowns, staff abuse or harassment, unsanitary facilities, and inadequate food and water. Mr. Vasenin has also experienced abusive solitary confinement for arbitrary or minor infractions, and all Plaintiffs and putative Class members live under constant threat of arbitrary punitive solitary confinement.

197. The named Plaintiffs have the requisite personal interest in the outcome of this action and have no interests adverse to the interests of the class. They will fairly and adequately represent the interests of all proposed class members.

198. The proposed class is represented by counsel from the ACLU of Illinois, ACLU of Indiana, National Immigrant Justice Center, Roderick & Solange MacArthur Justice Center, and the law firm Dunn Isaacson Rhee LLP. Counsel collectively have extensive experience litigating class action lawsuits and other complex cases in federal court, including on behalf of detained people and noncitizens, and people detained in immigration detention facilities specifically.

199. This action is maintainable as a class action pursuant to Rule 23(b)(1)(A) because the prosecution of separate actions by individual detainees would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Miami Correctional.

200. The proposed class meets the requirements of Fed. R. Civ. P. 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class through their policies and practices of detaining people at Miami Correctional in punitive conditions in violation of Plaintiffs' and the putative Class members' rights. Therefore, declaratory and injunctive relief are appropriate with respect to the proposed class as a whole.

## CAUSES OF ACTION

### COUNT ONE
***Violation of the Fifth Amendment***
***Conditions of Confinement***
***On Behalf of Plaintiffs and the Putative Class***
***Against All Federal Defendants***

201. Plaintiffs, on behalf of the putative Class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

202. Defendants have policies and practices of subjecting Plaintiffs and the putative Class members to objectively unreasonable conditions of confinement at Miami Correctional.

203. Under the Fifth Amendment, Defendants must provide for Plaintiffs' and the putative Class members' health, safety, and well-being while Plaintiffs and the putative Class members are in Defendants' custody.

204. Conditions of confinement for individuals in civil detention are unconstitutional if they are objectively unreasonable. Conditions satisfy this standard when (1) the conditions are objectively serious; (2) defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) defendants' actions were not rationally related to a legitimate governmental objective or excessive in relation to that purpose.

205. Conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, or that are excessive in relation to that objective, constitute punishment in violation of the Due Process Clause.

206. The conditions of confinement Plaintiffs and putative Class members face at Miami Correctional are objectively serious. Defendants subject Plaintiffs and the putative Class to conditions that amount to punishment, including excessive lockdowns, unwarranted solitary confinement, officer abuse, and extreme limitations on outdoor time and recreation. Defendants

also routinely fail to provide Plaintiffs and the putative Class members adequate access to basic necessities like food, water, hygiene items, sanitary facilities, medical and mental health care, and privacy. Each of these conditions has a mutually reinforcing effect that combines to create an especially grave constitutional violation. None of these conditions are reasonably related to a legitimate, non-punitive governmental objective.

207. Defendants have acted purposefully, knowingly, or recklessly in imposing the inhumane conditions at Miami Correctional Facility. Defendants have also refused increasingly frequent and urgent requests by detainees, elected officials, and the community to remedy the inhumane conditions at Miami Correctional. Internal IDOC reports, detainee deaths, widespread media reporting, letters from congressional representatives, and related lawsuits about Miami Correctional and other similar facilities nationwide have put Defendants on notice that the conditions at Miami Correctional are dangerous and unacceptable.

208. No legitimate governmental objective justifies the conditions at Miami Correctional Facility. At a minimum, any legitimate government objectives sought to be achieved by detaining Plaintiffs and the putative Class members could be accomplished under more humane conditions.

209. Defendants' policies and practices pertaining to conditions of confinement at Miami Correctional are thus objectively unreasonable and violate the Due Process Clause of the Fifth Amendment.

210. Defendants' policies and practices pertaining to conditions of confinement at Miami Correctional have caused, are causing and, if not enjoined, will continue to cause Plaintiffs and putative Class members to imminently suffer irreparable injury in the form of deprivation of

their fundamental rights, along with a range of severe physical, psychological, and emotional harms.

211. Plaintiffs and the putative Class members are entitled to declaratory and injunctive relief to avoid any further injury.

**COUNT TWO**
***Violation of the Fifth Amendment***
***Inadequate Medical and Mental Health Care***
***On Behalf of Plaintiffs and the Putative Class***
***Against All Federal Defendants***

212. Plaintiffs, on behalf of the putative Class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

213. Defendants have policies and practices of depriving Plaintiffs and putative Class members adequate and necessary medical and mental health care..

214. Defendants have acted purposefully, knowingly, or recklessly in subjecting detainees to inadequate healthcare at Miami Correctional Facility. Defendants have made an intentional decision to detain Plaintiffs and the putative Class conditions where, based on Defendants' practices and policies, they are exposed to a significant risk of serious harm. Internal IDOC reports, detainee deaths, widespread media reporting, letters from congressional representatives, and related lawsuits about Miami Correctional have put Defendants on notice that the medical and mental health care at the facility are unacceptable. Defendants have also violated their own detention standards.

215. Defendants have not taken reasonable available measures to abate this risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved. By not taking such measures, Defendants have caused Plaintiffs and the Class to face a

significant risk of harm. These actions violate Plaintiffs' rights under the Due Process Clause of the Fifth Amendment.

**COUNT THREE**
***Violation of the Fourteenth Amendment under 42 U.S.C. § 1983***
***Conditions of Confinement***
***On Behalf of Plaintiffs and the Putative Class***
***Against All State Defendants***

216. Plaintiffs, on behalf of the putative Class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

217. State Defendants have policies and practices of subjecting Plaintiffs and the putative Class members to objectively unreasonable conditions of confinement at Miami Correctional Facility.

218. Under the Fourteenth Amendment, Defendants must provide for Plaintiffs' and the putative Class members' health, safety, and well-being while Plaintiffs and the putative Class members are in Defendants' custody.

219. Conditions of confinement for individuals who are civilly detained by State officers are unconstitutional if they are objectively unreasonable. Conditions satisfy this standard when (1) the conditions are objectively serious; (2) defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) defendants' actions were not rationally related to a legitimate governmental objective or excessive in relation to that purpose.

220. Conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, or that are excessive in relation to that objective, constitute punishment in violation of the Due Process Clause.

221. The conditions of confinement Plaintiffs and putative Class members face at Miami Correctional are objectively serious. Defendants subject Plaintiffs and the putative Class to

conditions that amount to punishment, including excessive lockdowns, unwarranted solitary confinement, officer abuse, and extreme limitations on outdoor time and recreation. Defendants have also failed to provide Plaintiffs and the putative Class members adequate access to basic necessities like food, water, hygiene items, sanitary facilities, medical and mental health care, and privacy. Each of these conditions has a mutually reinforcing effect that combines to create an especially grave constitutional violation. None of these conditions is reasonably related to a legitimate, non-punitive governmental objective.

222. Defendants have acted purposefully, knowingly, or recklessly in imposing the inhumane conditions at Miami Correctional. Defendants have also refused increasingly frequent and urgent requests by detained people, elected officials, and the community to remedy the inhumane conditions at Miami Correctional. Internal IDOC reports, in-custody deaths, widespread media reporting, letters from congressional representatives, and related lawsuits about Miami Correctional and other similar facilities nationwide have put Defendants on notice that the conditions at the facility are unacceptable.

223. No legitimate governmental objective justifies the conditions at Miami Correctional Facility. At a minimum, any legitimate government objectives sought to be achieved by detaining Plaintiffs and the putative Class members could be accomplished under more humane conditions.

224. Defendants' policies and practices pertaining to conditions of confinement at Miami Correctional are thus objectively unreasonable and violate the Due Process Clause of the Fourteenth Amendment.

225. Defendants' policies and practices pertaining to conditions of confinement at Miami Correctional have caused, are causing and, if not enjoined, will continue to cause Plaintiffs

and putative Class members to imminently suffer irreparable injury in the form of deprivation of their fundamental rights, along with a range of severe physical, psychological, and emotional harms.

226. Plaintiffs and the putative Class members are entitled to declaratory and injunctive relief to avoid any further injury.

**COUNT FOUR**
***Violation of the Fourteenth Amendment under 42 U.S.C. § 1983***
***Inadequate Medical Care***
***On Behalf of Plaintiffs and the Putative Class***
***Against All State Defendants***

227. Plaintiffs, on behalf of the putative Class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

228. Defendants have policies and practices of depriving Plaintiffs and putative Class members adequate and necessary medical and mental health care.

229. Defendants have acted purposefully, knowingly, or recklessly in subjecting detainees to inadequate healthcare at Miami Correctional Facility. Defendants are intentionally detaining Plaintiffs and the putative Class conditions where, based on Defendants' practices and policies, they are exposed to a significant risk of serious harm. Internal IDOC reports, in-custody deaths, widespread media reporting, letters from congressional representatives, and related lawsuits about Miami Correctional have put Defendants on notice that the medical and mental health care at the facility are unacceptable. Defendants have also violated their own state laws and standards governing healthcare at prison facilities as well as the federal detention standards to which they are subject under the Agreement.

230. Defendants have not taken reasonable available measures to abate this risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk

involved. By not taking such measures, Defendants have caused Plaintiffs and the Class to face a significant risk of harm. These actions violate Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1. Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1)(A), and (b)(2);

2. Enter judgment for Plaintiffs and the putative Class and against Defendants;

3. Declare that the inadequate medical and mental health care and conditions of confinement imposed by Federal Defendants at Miami Correctional violates the Fifth Amendment Due Process Clause;

4. Declare that the inadequate medical and mental health care and conditions of confinement imposed by State Defendants at Miami Correctional violates the Fourteenth Amendment Due Process Clause;

5. Certify the Class as proposed above, appoint the Named Plaintiffs to serve as representatives of the Class, and appoint undersigned counsel to represent the Class;

6. Preliminarily and permanently enjoin Defendants from engaging in the unlawful conduct complained of herein;

7. Preliminarily and permanently enjoin Defendants from retaliating in any form against Plaintiffs, any class member, or any declarants or witnesses in this matter in their immigration proceedings or in any other capacity for asserting rights or otherwise participating in this proceeding;

8. Award counsel for Plaintiffs and the putative Class reasonable attorneys' fees and costs in this action under the Equal Access to Justice Act, 28 U.S.C. § 2412, and on any other basis justified under law; and

9. Enjoin Defendants from transferring Plaintiffs to other detention facilities outside the Seventh Circuit during the pendency of these proceedings;

10. Grant such other relief as the Court deems just and proper.

Dated: October 29, 2026

Respectfully submitted,

**COUNSEL FOR PLAINTIFFS**

/s/ Kevin M. Fee

Kevin M. Fee**

Michelle Teresa García**
Samuel B. Cole
Jennifer L. Stark**
Samantha Reed**
Kathleen Hickey**
Caroline Garau**
Katie Mayopoulos***
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 288-5225
kfee@aclu-il.org
mgarcia@aclu-il.org
scole@aclu-il.org
jstark@aclu-il.org

sreed@aclu-il.org
khickey@aclu-il.org
cgarau@aclu-il.org
kmayopoulos@aclu-il.org

Kenneth J. Falk
Grace C. Wenstrom
**ACLU OF INDIANA**
1031 E. Washington St.
Indianapolis, IN 46202
Phone: (317) 635-4059
Fax: (317) 635-4105
kfalk@aclu-in.org
gwenstrom@aclu-in.org

Mark Fleming
Eunice H. Cho
Mark Feldman
Allena Martin
**NATIONAL IMMIGRANT JUSTICE CENTER**
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Tel: 312-660-1628
mfleming@immigrantjustice.org
echo@immigrantjustice.org
mfeldman@immigrantjustice.org
amartin@immigrantjustice.org

Alexa Van Brunt**
Noor Tarabishy*
Danielle Berkowsky*
Chisato Kimura*
Anne Gottschalk*
Vatsala Kumar*
**MACARTHUR JUSTICE CENTER**
25 E. Washington St., Suite 1515
Chicago, IL 60602
Tel: (312) 373-1727
alexa.vanbrunt@macarthurjustice.org
noor.tarabishy@macarthurjustice.org
danielle.berkowsky@macarthurjustice.org
chisato.kimura@macarthurjustice.org
anne.gottschalk@macarthurjustice.org
vatsala.kumar@macarthurjustice.org

William A. Isaacson*
Amy J. Mauser*
John Paredes*§
**DUNN ISAACSON RHEE LLP**
401 9th St. NW
Washington, D.C. 20005
Phone: (202) 240-2900
wisaacson@dirllp.com
amauser@dirllp.com
jparedes@dirllp.com

Christine M. Ray*
**DUNN ISAACSON RHEE LLP**
11 Park Place
New York, NY 10007
Phone: (202) 240-2900
Cray@dirllp.com

Shelley R. Jackson*
**SHELLEY R. JACKSON, ESQ., LLC**
4806 23rd St. N.
Arlington, VA. 22207
Phone: (703)798-0902
Shelleyjackson798@gmail.com

*Motion for Pro Hac Vice admission to the U.S. District Court for the Northern District of Indiana forthcoming.

**Admission to the U.S. District Court for the Northern District of Indiana pending.

***Admission to the State of Illinois Bar pending.

§ Licensed in New York. Practice limited to matters before the U.S. federal courts and supervised by active members of the District of Columbia Bar while his application for admission to that bar is pending.